**WRIGHT–MOORE CORPORATION,
Plaintiff,**

**v.**

**RICOH CORPORATION, Defendant.**

**Civ. No. F 86–35.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Dec. 10, 1991.

Philip A. Whistler, Fred R. Biesecker, Ice Miller Donadio & Ryan, Indianapolis, Ind., Vincent J. Backs, Beers, Mallers, Backs & Salin, Fort Wayne, Ind., for plaintiff.

James P. Fenton, Robert S. Walters, Barrett & McNagny, Fort Wayne, Ind., for defendant.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on several motions for summary judgment filed by the defendant as well as on a motion to bifurcate, also filed by the defendant. The court heard oral arguments on the motions on October 31, 1991. For the following reasons, defendant's motions for summary judgment on the franchise issues, the claim for wrongful non-renewal, the claim for breach of credit terms, and the claim for punitive damages will be granted. Defendant's motion for summary judgment on the claims for consequential and other damages and defendant's motion to bifurcate will be denied [1].

### I. Factual Background and Procedural Posture

Plaintiff Wright–Moore Corporation is an Indiana corporation having a principal place of business in Fort Wayne, Indiana. Defendant Ricoh Corporation is a New York corporation with a principal place of business in West Caldwell, New Jersey. Plaintiff's complaint arises out of disagreements as to the interpretation and application of a product distribution agreement.

Plaintiff is an independent distributor of copiers, parts, and supplies. It has developed a network of independent authorized Wright–Moore dealers to purchase and resell its products. Plaintiff supports these dealers by providing service training for the products they handle, as well as offering the independent dealers favorable credit terms and minimal inventory requirements.

Defendant is a manufacturer of copiers and related parts and supplies. It distributes its products through independent distributors (such as Wright–Moore) as well as its own network of retail dealers. In late 1983, representatives of the parties discussed the possibility that Wright–Moore would become a major distributor of certain lines of copiers manufactured by

---

1. Additionally, plaintiff has filed a motion to file responses to defendant's sur-response concerning punitive damages, defendant's reply brief on the claim for alleged wrongful non-renewal of the distributorship agreement, and defendant's reply brief on the "marketing plan" and "trademark association" issues.

Defendant, in turn, has filed a motion to strike plaintiff's supplemental statement of genuine issues and supplemental appendix to summary judgment briefs, a motion to strike plain-tiff's response to defendant's reply brief on the "marketing plan" and "trademark association" issues, a motion to strike plaintiff's response to defendant's reply brief on the claim for alleged wrongful non-renewal of the distributorship agreement.

In order that the court may consider all of the arguments pertinent to defendant's motions for summary judgment, the plaintiff's motion to file responses is granted and all of defendant's motions to strike are denied.

Ricoh. In early 1984, the parties entered into an agreement whereby plaintiff would distribute Ricoh 3000 Series copiers. In July 1984, the parties entered into a national distributorship agreement under which plaintiff was appointed as a national distributor of Series 3000 and Series 4000 Ricoh copiers. The agreement was for a one year period. The parties also entered into a letter agreement, dated July 23, 1984. This letter agreement was sent to Ed Kane at Ricoh Corporation by Sachi Niyogi, the Controller of Wright–Moore Corporation and memorialized an oral agreement between the parties in which Wright–Moore agreed to purchase 1200 Ricoh copiers under specific terms. Ed Kane signed the bottom of the letter thereby confirming the terms set out in the letter.

Plaintiff claims that, in connection with its agreement with the defendant, it was assured that its relationship with Ricoh would be long term and that under Ricoh policy its national distributorship would be renewed as long as Wright–Moore satisfied its financial obligation to Ricoh and met its minimum purchase agreements. Plaintiff also contends that the continued success of its dealers caused dealers in Ricoh's own network to complain that Wright–Moore's aggressive pricing policy cut into their profits.

On July 27, 1989, this court entered summary judgment in favor of the defendant on plaintiff's claims of conspiracy to restrain trade in violation of the Sherman Anti–Trust Act, claims of violations of the Indiana franchise statutes, claims of breach of contract, claims of fraud and estoppel, and claims for punitive damages.

On August 28, 1990, the Seventh Circuit Court of Appeals, on appeal and cross appeal of this court's order, held that (1) Indiana franchise law applied to the case notwithstanding the New York choice of law provision in the distributorship agreement; (2) summary judgment was inappropriate as to whether Wright–Moore qualified as franchisee; (3) Ricoh's nonrenewal of the distributorship agreement for internal economic reasons, though not shown to be in bad faith, was not for good cause; and (4) summary judgment was not appropriate on one of Wright–Moore's contract claims, but was appropriate on the other contract claim and on claims of estoppel and fraud. The Court did not reach the issue of punitive damages [2]. *See Wright–Moore Corp. v. Ricoh Corp.*, 908 F.2d 128 (7th Cir.1990).

The Seventh Circuit remanded the case to this court for further proceedings, and after extensive discovery the defendant filed renewed summary judgment motions as well as a motion to bifurcate the franchise claims.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). Rather, Rule 56(c) places an affirmative burden on the nonmoving party and mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the nonmoving party's position is not sufficient to successfully oppose summary judgment;

---

**2.** The plaintiff did not appeal this court's grant of summary judgment in favor of the defendant on the plaintiff's anti-trust claim.

"there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* 106 S.Ct. at 2512; *In re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Tp. High School Dist. No. 204,* 802 F.2d 981, 986 (7th Cir. 1986).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact," *Celotex,* 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.1983), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 106 S.Ct. at 2511.

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *First National Bank of Cicero v. Lewco Securities Corp.,* 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 106 S.Ct. at 2512.

## II. Franchise Issues

### A. Background

Throughout this litigation, Ricoh has argued that Wright–Moore is not a franchisee and, therefore, Indiana franchise law does not apply. The term "franchise" is defined in *Ind.Code* § 23–2–2.7–5 by referring to *Ind.Code* § 23–2–2.5–1(a)(1), *et seq.* This statute, a part of the Indiana Franchise Act, provides in part:

Sec. 1. As used in this chapter:

(a) "Franchise" means a contract by which:

(1) a franchisee is granted the right to engage in the business of dispensing goods or services, under a marketing plan or system prescribed in substantial part by a franchisor;

(2) the operation of the franchisee's business pursuant to such a plan is substantially associated with the franchisor's trademark, service mark, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(3) the person granted the right to engage in this business is required to pay a franchise fee.

In this court's order of July 27, 1989, this court held that plaintiff had forwarded sufficient evidence to defeat defendant's claim that plaintiff was not a franchisee. The Seventh Circuit affirmed this holding and compared the present case with *Master Abrasives Corp. v. Williams,* 469 N.E.2d 1196 (Ind.App.1984). With respect to the first element of a franchise, existence of a marketing plan, the Seventh Circuit noted that there was sufficient evidence to establish a marketing plan. Likewise, with respect to the second element, substantial association, the Seventh Circuit held that plaintiff's evidence was sufficient to satisfy the substantial association requirement.

With respect to the third element, payment of a franchise fee, the Seventh Circuit held that the evidence on each of plaintiff's alleged fees was unclear. The Court of Appeals concluded that this court was correct in its decision that summary judgment was not appropriate at that time on the issue of whether plaintiff was a franchisee.

B. Marketing Plan and Substantial Association Issues

After extensive discovery, defendant again takes the position that plaintiff was never subject to any "marketing plan" prescribed by defendant and, further, the operation of plaintiff's business was not ever "substantially associated" with Ricoh's trademarks. Before reaching the merits of defendant's arguments on these issues the court will discuss plaintiff's argument that the Seventh Circuit has expressly decided these issues against Ricoh and, under the law of the case doctrine, Ricoh cannot relitigate these issues in this court.

In its discussion of the marketing plan and substantial association requirements, the Seventh Circuit stated:

With respect to the right to dispense goods, Ricoh argues there is not evidence that Wright–Moore was constrained by a marketing plan. In *Master Abrasives Corp. v. Williams*, 469 N.E.2d 1196, 1200 (Ind.App.1984), the Indiana Court of Appeals held that a marketing plan existed where the agreement allowed the franchisor to prescribe sales territories and sales quotas, approve sales personnel, and establish mandatory training. Our review of the record indicates that there is evidence that these elements are present here: Wright–Moore had a quota of copiers to sell; its territory was national; and Ricoh required personnel to go through mandatory training before allowing them to sell copiers. This is sufficient under *Master Abrasives* to establish a marketing plan.

Ricoh also contends that Wright–Moore was not substantially associated with its trademark. Ricoh primarily points to Article 6(b) of the distributorship agreement which prohibited Wright–Moore from using Ricoh's name or trademark in any manner. The same clause of the distributorship agreement, however, permits Wright–Moore to state in writing that it is an authorized distributor for certain Ricoh products. Moreover, Wright–Moore was provided with advertising materials with Ricoh's trademark. In *Master Abrasives*, the court held that "distribution of products or services covered by [the franchisor's] trademark" was sufficient to satisfy the substantial association requirement. *Id.* at 1199. Wright–Moore clearly meets this standard.

908 F.2d at 134–35.

The Seventh Circuit continued with a discussion of the evidence presented by the parties on the franchise fee issue, noting that the evidence was unclear on that issue. The Court then stated:

We conclude, as did the district court, that summary judgment was not appropriate on the issue of whether Wright–Moore was a franchisee.

*Id.* at 136.

Due to the Court of Appeals' conclusion that summary judgment was not appropriate on the issue of whether plaintiff was a franchisee, as opposed to a more specific conclusion that summary judgment was not appropriate on the issue of whether plaintiff was required to pay a franchise fee, defendant argues that the Court of Appeals was not deciding that plaintiff had met the first two requirements of a franchisee.

Although the Court of Appeals did not "decide" the marketing plan and substantial association issues, it did expressly state that plaintiff had presented sufficient evidence to defeat summary judgment on these issues. Although the parties have done additional discovery, the defendant has not come forward with evidence that undermines plaintiff's evidence. Consequently, there remains at least an inference that plaintiff could satisfy the first two franchise elements. Defendant has, in fact, admitted that a factual issue exists

with respect to plaintiff's "marketing plan" claim[3].

## C. Franchise Fee Issues

The court will next address defendant's argument that the defendant should be granted summary judgment on the issue of whether the plaintiff paid a franchise fee. Under the Indiana Code, a franchise fee is defined as:

> any fee that a franchisee is required to pay directly or indirectly for the right to conduct a business to sell, resell, or distribute goods, services or franchises under a contract agreement, including, but not limited to, any such payment for goods or services.

*Ind. Code* § 23–2–2.5–1(i).

Wright–Moore claims that it paid indirect fees in the form of payments to maintain excess inventory and payments for training. Although the Seventh Circuit held that the evidence on each of the alleged fees was unclear at the time the appeal was taken, the Court interpreted Indiana's franchise statute by reference to similar laws in other states and thereby provided this court with guidance in analyzing the evidence which the parties have presented to the court in connection with defendant's renewed summary judgment motion. Specifically, the Court of Appeals noted that the purpose of most franchise laws is to protect franchisees who have unequal bargaining power once they have made a firm-specific investment in the franchisor. With respect to the Wisconsin statute[4], the Court held that the central function of the statute was to "prevent[ ] suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand." *Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418, 419 (7th Cir.1990). In this case, the Court of Appeals stated that:

> The reason for the franchise fee requirement, in this light, is to insure that only those entities that have made a firm-specific investment are protected under the franchise laws: where there is no investment, there is no fear of inequality of bargaining power. Wright–Moore's alleged fees must, therefore, show evidence of unrecoverable investment in the Ricoh distributorship.

908 F.2d at 136.

### 1. Excessive inventory Claim

With respect to plaintiff's claim that defendant required it to purchase an excessive inventory, constituting an indirect franchisee fee, defendant first argues that plaintiff cannot establish that the 1200-machine purchase, provided for in the letter agreement, was *required* in order to obtain the right to distribute Ricoh copiers. Defendant contends that, as a matter of law, plaintiff's claim must fail because plaintiff seeks to vary the terms of the Agreement between the parties by parol evidence, a contention which is forbidden by the integration clause of the Distributorship Agreement which provides as follows:

> *Entire Agreement.* This Agreement with attached Exhibits is intended to be the full and complete statement of the obligations of the parties relating to the subject matter hereof, and supersedes all previous agreements, understandings, negotiations and proposals as to this Agreement. No provision of this Agreement shall be deemed waived, amended or modified by either party unless such waiver, amendment or modification shall be in writing and signed by a duly authorized officer of the party against whom the waiver or modification is sought to be enforced.

Distributorship Agreement, Article 10(d).

▉ Defendant concludes that the Distributorship Agreement itself is the only source from which the alleged "excess inventory" requirement can flow, the Agreement does not state that the letter agree-

---

**3.** See Ricoh's Reply Brief, filed October 25, 1991, at 9, wherein defendant states: "There is now an issue, relating to one of the indicia of a 'Marketing Plan' noted by the Seventh Circuit

on the limited record, and the issue is whether this was in fact ever a 'Ricoh requirement'."

**4.** Wis.Stat. § 135.025(2).

ment purchase of 1200 machines was required by Ricoh as a fee paid for the right to do business, and the integration clause prevents any parol evidence on this point.

The court disagrees with the defendant. As both this court and the Seventh Circuit have held, the Distributor Agreement and the Letter Agreement must be construed together, because they were contemporaneously executed documents dealing with the same subject matter. *See* Order of July 28, 1989 at 41 and 908 F.2d at 140. Thus the court will examine the letter agreement to determine whether, as plaintiff suggests, the letter agreement requires the purchase of 1200 copiers in exchange for the right to do business.

At this point, defendant puts forth the argument that "the undisputed evidence will show that there was no linkage between the 1200–machine order and the Distributorship Agreement." Defendant's evidence consists of deposition testimony of Ed Kane, an ex-Ricoh employee who contacted Mr. Wright regarding the purchase. Kane testified that the distributorship agreement was not conditioned on the 1200–machine order[5]. Kane's deposition testimony also further indicates that the terms of plaintiff's 1200–machine purchase were intended to reflect an additional quantity discount[6]. Defendant also submits evidence that the parties had already agreed to all the terms of the 4030/4060 Distributor Agreement, and plaintiff had begun to market these products weeks before the July 23, 1984 letter agreement was entered into.

In response, plaintiff points to the affidavit and deposition testimony of Jack Wright that the two agreements were linked[7]. Plaintiff further explains to the court that Kane's early deposition testimony was erroneous as the result of an incorrect recollection on Kane's part. Kane corrected his testimony later and specifically agreed that if Wright–Moore had not entered into the agreement to order 1200 machines, Ricoh would not have made

Wright–Moore a distributor for the 4000 Series in July of 1984. Plaintiff also argues that Ricoh refused to execute and return the Distributorship Agreement to the plaintiff until plaintiff had agreed to purchase 1,200 machines from Ricoh pursuant to the letter agreement. In reply, defendant denies that there is any evidence to support plaintiff's statement that Ricoh refused to execute and return the Distributorship Agreement until after plaintiff agreed to purchase 1200 machines.

Although there does not appear to be any direct evidence on this point, defendant's Exhibit 158 establishes that a copy of the executed Distributorship Agreement was not forwarded to Wright–Moore until July 23, 1984, the date of the letter agreement. A reasonable inference to be drawn from defendant's Exhibit 158 is that Ricoh refused to execute the Distributor Agreement until plaintiff executed the letter agreement.

Defendant also contests plaintiff's submission of Wright's affidavit and deposition testimony claiming that Wright's earlier deposition testimony contradicts later testimony. Specifically, defendant claims that in Wright's first deposition, taken on May 21 and 22, 1986, at page 323, Wright testified that the 1200–machine purchase order was negotiated and finalized prior to the subject of the 4000 Series Distributorship even coming up and that the 4000 Series Distributorship was not an inducement to the purchase of 1200 machines. A review of Wright's early deposition testimony reveals that the one page excerpt is extremely inconclusive. All this court is able to glean from Wright's testimony is that Kane called Wright attempting to get Wright to place an order for 1200 machines at a certain price and, according to Wright, that if Wright agreed to buy the machines "we'll make you a distributor of the 4000 machine." Depending on the date of this conversation, and the date Ricoh executed the final Distributorship Agreement, this statement by Kane to Wright could be con-

---

**5.** Kane Dep. (I) at 26–27.

**6.** *Id.* at 37–41.

**7.** Wright Aff. filed July 16, 1986; Wright Dep. (II) at 1256–57.

strued as an attempt by Ricoh to condition the Distributorship Agreement on the 1200–machine purchase. The court concludes that plaintiff has submitted enough evidence to prevent the court from ruling that, as a matter of law, the 1200–machine purchase was not in exchange for the right to do business.

■ Defendant next argues that the 1200–machine purchase, even if required, did not constitute an excess, unreasonably large, or illiquid inventory, and thus was not an indirect franchise fee. Rather, according to the defendant, the 1200–machine purchase was a one-time order which plaintiff obtained on very favorable terms. Defendant has presented evidence that in the first three months after the 1200 machines arrived in inventory, plaintiff resold 70% of them and by the end of the next month plaintiff had sold 90% of the machines. By the end of the next month plaintiff had sold more machines than it had originally ordered. Defendant argues that the 1200–machine purchase was hardly illiquid because virtually all of the machines were resold at a profit by Wright–Moore even before Wright–Moore was required to make final payment for the machines to Ricoh.

Defendant also points out that the certified audit of Wright–Moore as of August 31, 1984 (when 1,117 of the 1200 machines were in stock) reported no excess inventory and concludes that the letter agreement did not impose any excess inventory cost on plaintiff, but, rather, conferred an immediate windfall on plaintiff.

Plaintiff, however, strongly asserts that the overall question of whether a particular investment represents a "franchise fee" must be answered in light of the relationship of the parties as it existed at the time of the investment, and not merely with the benefit of hindsight after plaintiff's profits have been tabulated. Plaintiff quotes portions of the Illinois Administrative Code [8] and the Seventh Circuit's opinion [9] in support of its position that the relevant test is whether, as a result of the excessive inventory purchase, the defendant occupied a position where it could take opportunistic advantage of the plaintiff. Although the court agrees with the defendant that the Seventh Circuit did not hold that a "potentially" illiquid inventory can be an indirect franchise fee, the court agrees with the plaintiff that the question to be resolved is whether the inventory purchase placed the defendant in a position where it could take opportunistic advantage of the plaintiff. Thus, the court must examine the evidence relating to the position of the parties before, during, and after the 1200–machine purchase to determine whether defendant placed plaintiff into a subordinate position such that defendant could act opportunistically.

Defendant submits evidence that plaintiff received a huge discount on its 1200–machine order, which gave plaintiff an advantage over all other distributors, and resulted in the quick sale of the machines. The evidence shows that, as a practical matter, plaintiff did have a price advantage over other Ricoh distributors, but only because plaintiff purchased such a large volume of copiers (the largest single order in Ricoh's history). The evidence also shows that other distributors would have received additional discounts, identical to plaintiff's discounts, if they had placed large orders and, likewise, plaintiff would not have received such favorable discounts if it had placed a smaller order.

---

**8.** The Illinois Administrative Code provides in part that:

[A]n indirect franchise fee ... is present despite the bona fide wholesale or retail price exceptions if the buyer is required to purchase a quantity of goods so unreasonably large that such goods may not be resold within a reasonable time.

14 Ill.Adm.Code, Ch. II § 200.108.

**9.** The Seventh Circuit stated that:

The purpose of the fee requirement also indicates that, depending on the particular facts of a case, investments in excess inventory may constitute an indirect franchise fee. If, for example, the excess inventory were not liquid or were such that the franchisor could prevent it from being liquid (perhaps by preventing the franchise from claiming it is an authorized dealer), then the excess inventory might be a franchise fee.

908 F.2d at 136.

Even though plaintiff received special terms on its large volume purchase, plaintiff argues that the 1200–machine inventory was greatly in excess of its needs. Plaintiff points to Wright's deposition testimony wherein Wright indicated that during plaintiff's first six months of selling Ricoh machines, plaintiff sold a little less than 300 machines [10]. Plaintiff argues that past sales is the best predictor of future sales and thus once plaintiff had purchased 1200 machines, plaintiff has sunk such a large amount of its assets into "tailoring its business around" Ricoh copiers that defendant could get terms and concessions from plaintiff that it could not get from a new distributor who had not made a similar investment in its brand. For example, plaintiff argues that defendant had the power to prevent plaintiff's inventory from being "liquid" simply by refusing to let plaintiff sell to Ricoh dealers and plaintiff's quick sales of copiers in 1984 resulted primarily from Ricoh's request that plaintiff sell machines to Ricoh dealers during a shortage.

Plaintiff further argues that it sold many machines back to Ricoh, at cost, and sold many others to Ricoh dealers at a lower profit margin. Plaintiff cites Wright's deposition testimony in support of its argument that it lost money, or at least didn't make any money, on sales of copiers to Ricoh and Ricoh dealers. However, this testimony is rambling, inconclusive and, in some places, inconsistent. In any event, the court finds plaintiff's evidence to be irrelevant because plaintiff has not shown that plaintiff was *forced* to sell to Ricoh at cost, or to Ricoh dealers at a low profit margin. Rather, the evidence strongly suggests that plaintiff acceded to defendant's wishes in order to prove to defendant that plaintiff was a "good buddy" and therefore defendant should keep selling copiers to plaintiff. In fact, according to Kane's testimony, Kane contacted Wright concerning Ricoh's inventory availability problem, gave Wright-Moore permission to sell copiers to Ricoh dealers, but told Wright to take care of his own dealers

first. Wright then told Kane that Wright-Moore would be happy to sell to Ricoh dealers [11].

In light of the above evidence it is abundantly clear that, since the Ricoh machines were scarce, plaintiff could have sold the machines at almost any price to anyone it wished to, but chose to sell to Ricoh and Ricoh dealers for strategic reasons and was not the victim of Ricoh's "opportunistic" behavior. This conclusion is buttressed by defendant's evidence that, although plaintiff sold 280 machines back to Ricoh at cost, it did so under a "swap agreement" whereby Ricoh agreed to ship plaintiff 250 of the FT3050 machines by November 30, 1984 and to give plaintiff an option to buy another 250 FT3050 machines by December 31, 1984 [12].

Plaintiff, in further response to defendant's motion for summary judgment on the franchise fee issue, argues that the high percentage of plaintiff's sales represented by Ricoh machines presumptively demonstrates the existence of a franchise relationship. Plaintiff claims that as a result of plaintiff's large volume purchase of Ricoh machines its sales mix became 80% Ricoh and 20% other brands, and that this is the sort of dependence on a single supplier which the Seventh Circuit has explicitly stated creates the risk of opportunistic behavior by suppliers.

Plaintiff cites *Fleet Wholesale Supply Company v. Remington Arms Company, Inc.*, 846 F.2d 1095 (7th Cir.1988), in which the Seventh Circuit noted that the Wisconsin Fair Dealership Law was designed to regulate the franchise relation, on the premise that the franchisor has the franchisee "over a barrel" after their business dealings begin, and further stated that:

> Firms buying only a small portion of their needs from a single supplier can more readily turn to other sources ... and suppliers correspondingly have little ability to extract concessions; competition prevents it. The smaller the portion

---

10. Wright Dep. (II) at 1699–1701.

11. Kane Dep. (I) at 33–34.

12. Defendant's Exhibit 81.

of sales from a single source, the less (ex post) market power the supplier possesses.

\*   \*   \*   \*   \*   \*

The district court was entitled to conclude that 0.5% of sales—an order of magnitude smaller than the least found to satisfy the Act to date—is unlikely to be covered.

846 F.2d at 1097.

In *Fleet Wholesale*, the Seventh Circuit was only concerned with the application of the Wisconsin Act to the denial of a preliminary injunction. Nothing in the case indicates that if a distributor purchases a large percentage of its inventory from a single supplier that the inventory purchase is transformed into a franchise fee. The Third Circuit recently addressed this very issue in *Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.*, 944 F.2d 1131 (3d Cir. 1991) in which approximately 95% of the sales of the distributor (Cassidy) were attributable to one supplier (Snyder). The Court stated:

> Although we recognize that Cassidy was in a more vulnerable position than Neptune because Snyder was Cassidy's predominant supplier, we do not think reliance on a single supplier automatically qualifies a distributor for protection under the New Jersey Franchise Act. If it did, all exclusive distributors could unilaterally decide to convert their distributorships into franchises without regard to the shared intent of the parties in entering into the distributorship agreement. (Footnote omitted).

*Id.* at 1141–42.

Considering the particular facts of this case, the court finds the holding of *Cassidy Podell* to be applicable. First, the Agreement between Ricoh and Wright–Moore was "non-exclusive" and Wright–Moore was free to sell other brands of copiers. Second, 90% of the 1200 machines ordered in July of 1984 had been sold by the end of November 1984, and plaintiff chose, on its own, to purchase additional machines. If Ricoh had any ability to act opportunistically, this ability was created by Wright–Moore by its act of continuing to purchase Ricoh copiers to the exclusion of other brands.

In a final effort to avoid summary judgment, plaintiff argues that "there are numerous disputed issues of fact concerning the excessiveness of the 1,200 machine purchase which preclude summary judgment." First, plaintiff claims that there are disputes over whether the inventory could be sold within a "reasonable" time. The evidence has clearly shown that the machines were very much in demand and moved rapidly. Further discussion of this evidence is unwarranted. Next, plaintiff asserts that the evidence is in conflict as to whether the price terms under which plaintiff purchased the 1200 machines gave the plaintiff an advantage in the marketplace. This evidence has also been discussed earlier and the conclusion of this court is that the evidence shows that plaintiff was given price breaks on its 1200 machine order but that any distributor who ordered 1200 machines would receive the same price breaks, *i.e.*, the price was determined by the quantity purchased not by who the purchaser happened to be.

█ Further, plaintiff contends that the parties dispute "whether plaintiff's outside auditors ever asked the plaintiff if it had any excessive inventory, and if so, what plaintiff's response was, and what inferences should be drawn therefrom." Even if this point is disputed, the court finds it to be irrelevant. In light of the large volume of evidence showing that the 1200–machine purchase was not excessive or slow-moving, no reasonable jury could find that the inventory was so excessive as to constitute an indirect franchise fee merely because an auditor did or did not consider the plaintiff to be overstocked, for accounting purposes, in Ricoh copiers.

█ Also, plaintiff also argues that what constitutes a "normal" inventory of copiers is another disputed question of fact. This question of fact, if there is in fact a question, is not material because plaintiff was not a "normal" distributor. Plaintiff was a national distributor and, as such, was expected to place large orders for which it

received substantial discounts. The 1200–machine order was the largest plaintiff had ever placed and the largest defendant had ever received. "Normal" inventories, if such inventories exist, have no relevance to this case.

Plaintiff's other "disputed facts" discussed at the end of plaintiff's brief have been considered earlier in this order and the arguments will not be repeated here.

### 2. Training Expense Claim

Plaintiff's second indirect "franchise fee" claim is that various costs it allegedly incurred in training some of its dealers constitute a franchise fee. Defendant, in support of its motion for summary judgment on the franchise fee issues, argues that service-training was an ordinary business expense of Wright–Moore before, during, and after the Ricoh contract, and, moreover, such training was indispensable to Wright–Moore's own method of doing business. Defendant has submitted substantial evidence showing that service training was, historically, indispensable to plaintiff's method of distributing copiers as an "independent" wholesaler. See e.g., Defendant Exhibit 314; Wright Dep. (I). In fact, Mr. Wright described service training as "just an expense we have for doing business." [13]

Nevertheless, plaintiff argues that its investments in training were both substantial and firm-specific. Plaintiff claims that training on copier machines is totally "firm specific" and is even "model specific" and plaintiff's acts of training its technicians and dealers to service Ricoh brands had the effect of tailoring the plaintiff's business around Ricoh copiers. Plaintiff has submitted various deposition testimony establishing that Ricoh required Wright–Moore's technicians and dealers to attend training classes for each of its series of copiers and only rarely accepted training on other brands of copiers as the equivalent of Ricoh training. However, as defendant points out, plaintiff has failed to show that

this training was firm-specific because plaintiff has failed to show that Ricoh training was not transferable [14].

Plaintiff further claims that its expense of sending its training manager to Ricoh for a five-day course for certification as a "Train the Trainer" instructor constituted an indirect "franchise fee." Defendant, however, argues that the evidence conclusively demonstrates that Wright–Moore voluntarily elected to qualify its service training manager as a certified instructor. Defendant directs the court to its Exhibit 1004, at page 200–20 of the Ricoh Distributor Service Manual where Ricoh's "Train the Trainer" program is described as follows:

A Train-the-Trainer program is provided to assist Distributors who have a need to train a large number of technicians on a specific product. Distributors who have this need and have the proper facilities and a qualified instructor are eligible for this program. This program is designed to help support these Distributors with their training needs.

Plaintiff, in turn, argues that the evidence shows that Ricoh refused to train Wright–Moore's dealers, and thus Wright–Moore was necessarily required to participate in the Train-the-Trainer program and that this constitutes an indirect franchise fee. A review of the evidence discloses the following relevant information.

The Distributor Agreement, Exhibit F, which deals with warranties and technical service support requirements, provides in pertinent part:

1. It is the responsibility of DISTRIBUTOR to provide *all aspects* of Technical Service Support established by RICOH for Customers and end-users in connection with Products sold by DISTRIBUTOR. Such support shall include technical training of service personnel, parts and "hot line" support and other services

---

**13.** Wright Dep. (I) at 140.

**14.** See Meyers Dep. (I) at 443 wherein Meyers agreed that "if you know about bond paper

technology in a copier machine you're going to find something like that in almost every machine in the industry."

as RICOH may specify from time-to-time.

\* \* \* \* \* \*

4. For 4030/4060 Distributors, the following specific items must be adhered to:

- Service *must approve* Distributor Technical Training Program and if Ricoh "Train the Trainer" Program is utilized, Distributor must sign agreement upon signature of this Distributor Agreement.
- Distributor must purchase minimum Parts Support List to be developed.
- Distributor represents that prior to shipment of any 4030/4060 product to a Dealer, said Dealer will have in his employ a trained 4030/4060 Service Technician.

Plaintiff further presents deposition testimony of several witnesses. Plaintiff claims that these witnesses testified that Ricoh would not train Wright–Moore dealers, and that therefore Wright–Moore had no alternative but to train those dealers itself under Ricoh's train the trainer program. A review of these deposition excerpts reveals that the witnesses simply testified that the dealers had to have training before Ricoh would ship them any machines. Defendant's witness, Dan Piccoli,

testified [15] that in 1984 and until approximately November of 1985, Wright–Moore's dealers were eligible to attend Ricoh's training school pursuant to the "Dealer/End–User Training" program described at page 200–15 of the August 1984 Distributor Service Manual [16]. Consequently, the court finds that Wright–Moore's expense of sending its training manager for certification as a "Train the Trainer" instructor does not constitute an indirect franchise fee.

■ Finally, defendant argues that all of the expenses of service-training claimed by Wright–Moore were not only "recoverable" but were fully recovered [17], as ordinary business expenses. First, defendant asserts that Wright–Moore's service-training function was a function which was one part of the normal operations of any wholesale distributor of serviceable products, thus, as a matter of law, Wright–Moore completely recovered its costs of performing this function, through the normal 18% discount which Ricoh extended to distributors. Second, defendant claims that Wright–Moore recovered it training costs at the training sessions because all students enrolled for training were required by Wright–Moore to purchase a copy machine and, moreover, each student purchased manuals and other study materials. Third, defendant contends that Wright–Moore has continued to

---

15. *See* Piccoli Errata.

16. The Distributor Service Manual specifically stated that:

Ricoh Corporation will provide customer Technical Training for distributor's Users (Dealer/End–User) at the following schedule:
Fee: $150.00 per day Monday through Friday
$ 50.00 per day Saturday and Sunday
NOTE: Fee payable in advance
*Ricoh Corporation* will provide a professionally conducted Training seminar with all course related material, i.e. Technical Manuals, Parts Manuals, Bulletins, Schematics, etc. Also provided are double-occupancy rooms, lunches during class, welcome dinner and all transportation to and from the hotel to the Training facility. The same policies and procedures applied to the Distributor Technicians also apply to the Dealer/End User Technicians. They must be capable of passing the Training Program.
*Local Distributor* is responsible for supporting the Dealer/End–User with parts and supplies.

In addition, the local Distributor is responsible for supporting the Dealer/End–User with on-site technical assistance. Ricoh Corporation can only accept "Hotline" calls from *Distributor* and trained Dealer personnel. In the event that "Hotline" support is required, the Distributor and their Dealer trained technician that has been Ricoh certified on the product must place the "Hotline" call.

17. The Seventh Circuit's opinion stated the following with respect to training costs:

Costs incurred in training, Wright–Moore's second alleged fee, may, for the same reasons, also result in an indirect franchise fee. Training can be highly firm-specific. Technicians trained to service Ricoh copiers may not be able to service other copiers. Costs incurred during training may be substantial and unrecoverable, locking the franchisee into the franchisor.

\* \* \* \* \* \*

[T]here is conflicting evidence about the nature and extent of the training program. . . .

sell Ricoh parts regularly because Wright–Moore's customers continue to service the Ricoh machines. Finally, defendant argues that Wright–Moore recovered many times its Ricoh-related service training costs through its net profits earned during the year it sold Ricoh products.

Plaintiff takes the position that a "recoverable investment" is one that is in effect not at risk in the business. Plaintiff cites *Moore v. Tandy Corp.*, 819 F.2d 820 (7th Cir.1987), and *Moodie v. School Book Fairs, Inc.*, 889 F.2d 739 (7th Cir.1989), in support of its position. In *Moore*, the Seventh Circuit undertook the task of determining whether a Radio Shack store manager was a "dealer" within the meaning of the Wisconsin Fair Dealership Law by virtue of his "investment" of a $70,000 security deposit to the Tandy Corporation. The court first noted that:

> [T]he investment that turns an employee into a dealer by creating a community of interest between him and his supplier must be the kind of investment that involves a risk of, or temptation to, opportunistic behavior by the supplier.

> \*   \*   \*   \*   \*   \*

Moore did not make the *kind* of investment that dealers customarily make and that places the dealer in the supplier's power and thereby provides the principal rationale for the Wisconsin statute. It was not an investment sunk in specialized resources (such as a store's interior) which would be worth less in another use. "Such investments," we read in an opinion that is very much in the spirit of our analysis, "often cannot be liquidated except on terms which are unfair to dealers and which sometimes unjustly enrich dealership grantors. Similarly, a heavy 'front-end' dealer investment in advertising might qualify for WFDL [Wisconsin Fair Dealership Law] protection because the dealer might otherwise be unjustly deprived of a return on that investment if the venture is successful. The [Wisconsin law] protects dealers who risk their investments along with the manufacturers." *Aida Engineering, Inc. v.*

*Red Stag, Inc.*, 629 F.Supp. 1121, 1126 (E.D.Wis.1986).

\*   \*   \*   \*   \*   \*

But Moore's was an investment whose value was fixed, protected, and recoverable with only modest delay. It was not an investment in advertising materials that would become worthless if he ceased to sell the advertiser's goods. His investment was not at risk (except in the sense that Tandy, like any other firm, might go broke). Far from locking Moore into a perhaps unwanted embrace with his supplier, the requirement of a substantial security deposit made it easier for Moore to find alternative employment; it was a form of forced saving for him, which would ensure that he had a nest egg with which to start over if he lost his job, or at least the wherewithal to repay any business loans he may have taken out in connection with his managership. If the exaction of the security deposit made it easier for Radio Shack to expand—if "security deposit" was to that extent a misnomer—still that fact alone cannot condemn an arrangement that does not have the usual elements of a dealership.

819 F.2d at 822–24.

In *Moodie*, the Seventh Circuit again decided the question of whether the Wisconsin Fair Dealership Law extended to protect an alleged "dealer":

> Moodie had a significant firm-specific investment in both goodwill and in specialized materials. The amounts he spent on the customized shed and building goodwill are not recoverable on the market. In addition, some portion of the amounts spent on the truck are also not recoverable. Therefore, SBF had Moodie "over the barrel" at least as far as Moodie had made these investments in SBF. In addition, Moodie worked for SBF for over 5 years and derived all of his income for nine months of the year from SBF. Moodie had been granted exclusive territory of fourteen counties, employed two part-time helpers, and used SBF stationery and business cards. Applying the *Ziegler [Co. v. Rexnord, Inc.*, 139 Wis.2d

593, 407 N.W.2d 873 (1987)] criteria to these facts, we conclude that Moodie satisfied the community of interest requirement and therefore, Moodie was a dealer. (Footnote omitted).

889 F.2d at 744–45.

Defendant argues that *Moore* and *Moodie* do not establish that "recoverability" means a "no-risk" investment, but rather, the cases establish that a "no-risk" investment is clearly recoverable, and that a *firm-specific* investment must be made before it is even material whether the investment is recoverable. Defendant directs the court to *Kenosha Liquor Co. v. Heublein, Inc.*, 895 F.2d 418 (7th Cir.1990) and *Schultz v. Onan Corp.*, 737 F.2d 339 (3d Cir.1984), claiming that these two cases are more applicable to the facts of this case than are *Moore* or *Moodie*.

In *Kenosha* the Seventh Circuit, again wrestling with the Wisconsin Fair Dealership Law, reiterated that:

> We have deduced from the structure and history of the statute a central function: preventing suppliers from behaving opportunistically once franchisees or other dealers have sunk substantial resources into tailoring their business around, and promoting, a brand. See *Moodie v. School Book Fairs, Inc.*, 889 F.2d 739, 742 (7th Cir.1989); *Fleet Wholesale*, 846 F.2d at 1097; *Moore v. Tandy Corp.*, 819 F.2d 820, 822–24 (7th Cir.1987). This implies that unless a large portion of the business is committed to a supplier, or the reseller has substantial assets specialized to that supplier's goods, there is no opportunity to exploit by changing the terms in mid-stream, no terms other than those applied to all middlemen, hence no "community of interest", and so no statutory "dealership".

> \* \* \* \* \* \*

> Jose Cuervo [brand tequila] yields less than 6% of Kenosha Liquor's sales. Although *Ziegler* implies that 8% of sales (the amount in *Ziegler* itself) could be enough if other factors suggest "dealership", there are not (pertinent) other factors here. Kenosha Liquor distributes Jose Cuervo through its regular

> means. Its premises, trucks, and so on all bear its own markings; it has not pointed to a single business asset that is not useful in distributing Remy Martin cognac to the same degree it may be used in handling Jose Cuervo tequila. No matter what the contract said Heublein *could* do to tie Kenosha Liquor's hands, Heublein did not. So it was in no position to exploit a sunk investment, to force Kenosha Liquor to pay (indirectly) more than the market price of the tequila that a new distributor, who had not yet had any dealings with Heublein, would be willing to pay.

895 F.2d at 419.

In *Schultz* the Third Circuit, in determining the proper measure of damages under the Minnesota recoupment doctrine (in which a distributor is entitled to damages in the amount of its unrecouped expenditures), stated that:

> "[U]nrecouped expenditures" refers to the initial or continuing investment required of the franchisee, reduced to the extent that profits were earned by the distributorship as a fruit of the investment. *Id.* In particular, "unrecouped expenditures" includes any unamortized capital expenditures that would have produced future profits (or reduced future costs) had the distributorship continued in existence.

737 F.2d at 348.

Under the principles enunciated in the above-cited cases, it is clear that plaintiff recovered its training costs. First, there is no evidence that plaintiff's training costs constituted an investment sunk in specialized resources which would be worthless in another use. Plaintiff's dealers received expert service training on Ricoh models, and presumably they will need to service Ricoh copiers for years to come even though plaintiff is no longer a Ricoh distributor. Also, plaintiff has not shown that the Ricoh training was non-transferable, and this lack of evidence creates the inference that plaintiff's dealers could easily learn to service other brands of copiers with little or no formal training. Further, Rex Myers, plaintiff's chief instructor,

learned basic teaching fundamentals in Ricoh's "Train the Trainer" program. Myers admitted that Ricoh's training program was a good one, and, obviously, Myers will be able to apply these basic teaching principles to almost any copy machine servicing class he wishes to conduct.

Second, just as Moore's security deposit was a form of forced saving, plaintiff's dealers' training was a form of "forced education" which required the dealers to learn to service the "most technologically innovative" copy machines, which education could easily benefit plaintiff, at least to the extent plaintiff is able to persuade his dealers to remain his customers. Again, as in *Moore*, if the training requirement made it easier for Ricoh to expand, by persuading plaintiff's dealers to leave plaintiff and join forces with Ricoh, this fact alone cannot condemn an arrangement that does not have the usual elements of a franchise.

Nevertheless, the court will address plaintiff's other arguments with respect to the recoverability of the training costs. Plaintiff contends that defendant's recoverable investment argument is also factually wrong because it erroneously assumes that training resulted in incremental copier sales. Plaintiff states that the "obvious fallacy" of defendant's argument is that it ignores the fact that plaintiff's student/dealers took the one machine they were required to purchase for class back to their dealerships and sold them, resulting in one less machine ordered in their first order, so that the net incremental sales of machines resulting from the dealer training was zero. Plaintiff cites Merten's deposition testimony in support of its position. However, the cited deposition testimony is completely irrelevant to the issue. The court agrees with the defendant that whether the sale of the copiers to the stu-

dents resulted in incremental sales for plaintiff is irrelevant as plaintiff clearly sold those machines as a result of running its training program.

Next, plaintiff disputes defendant's assertion that plaintiff recovered the cost of service training because it received an 18% distributor discount. Plaintiff claims that other distributors who provided no dealer training received the same 18% discount. However, as defendant points out, the only impact of a potentially improper grant of a distributor discount is a claim under the Robinson–Patman Act [18] by the injured party. The improper discount does not affect the continued grant of the distributor discount to the properly performing party, and, thus, recoverability would still have occurred.

Accordingly, the court will grant summary judgment for the defendant on the issue of whether plaintiff is a franchisee. Although plaintiff has presented sufficient evidence as to the first two elements of a franchise, existence of a marketing plan and substantial association, plaintiff has not presented sufficient evidence on the third element, *i.e.*, that it was required to pay a franchise fee. Consequently, as a matter of law, plaintiff is not a franchisee as that term is defined by the Indiana statute.

### D. Wrongful Non–Renewal Claim

■ However, assuming that Wright–Moore would be able to convince this court that it is a franchisee under the Indiana act, the court will discuss defendant's motion for summary judgment on the issue of wrongful non-renewal of the franchise agreement [19]. Defendant first argues that even if Wright–Moore is a franchisee and Ricoh failed to renew the franchise agreement without good cause in violation of

---

**18.** The Robinson–Patman Act, 15 U.S.C. § 13(a), makes it unlawful to "discriminate in price" between purchasers at similar competition levels in the distribution chain. Arguably, if a competitor received an 18% discount without performing the distributor function of dealer training, then the manufacturer has engaged in price discrimination with respect to the distributors.

**19.** *Ind.Code* § 23–2–2.7–1(7), (8) declare unlawful any provision in a franchise agreement which permits the franchisee to be terminated or not renewed "without good cause or in bad faith."

*Ind. Code* § 23–2–2.7–1, as alleged, the Indiana act was not intended to have extraterritorial effect and thus was not intended to protect the "national" distributorship relationship established between Wright–Moore and Ricoh under the Distributorship Agreement.

The Indiana Deceptive Franchise Practices Act applies only when the franchisee is "either a resident of Indiana or a nonresident who will be operating a franchise in Indiana." [20] Ricoh admits that Wright–Moore, an Indiana corporation with its principal place of business in Indiana, is entitled to the protections available under the statute, assuming it is a franchisee. Ricoh merely contests the scope of that protection. Specifically, Ricoh argues that the statute only protects a franchisee's activities that take place in Indiana. Wright–Moore, of course, takes the position that the Indiana legislature clearly intended to protect Indiana franchisees even when the franchisee's operations include other states in addition to Indiana.

Indiana has a general policy of refusing to give statutes extraterritorial effect. *W.H. Barber Co. v. Hughes*, 223 Ind. 570, 63 N.E.2d 417, 424 (1945); *Indiana Harbor Belt Railroad Co. v. Public Service Comm'n*, 147 Ind.App. 652, 263 N.E.2d 292, 298 (1970). Clearly, other states' legislatures can give protection to franchises within their states' borders if they so wish. Thus, the burden on plaintiff to convince the court that the Indiana franchise act should be applied extraterritorially is a heavy one.

Plaintiff directs the court to *Wilburn & Associates v. Jack Cartwright, Inc.*, Bus. Franchise Guide ¶ 7645 (E.D.Wis.1979), in support of its position. The *Wilburn* Court, applying the Wisconsin Fair Dealership Law (which applied to "grantees of a dealership situated in this state"), held that:

The plaintiff in this case is a Wisconsin dealer. Thus, the fact that the dealership agreement called for performance in several states in addition to the state of Wisconsin is not a ground for denying the application of the provisions of the fair dealership law to the defendant's termination of the plaintiff's entire dealership.

Plaintiff argues that the same result is called for in this case and that because plaintiff is an Indiana franchisee, the Indiana statute applies to Ricoh's failure to renew the entire franchise.

Defendant, in reply, admits that in *Wilburn,* the court was willing to give extraterritorial effect to a statute in a situation where there was a multi-state franchisee. Defendant argues that *Wilburn* was decided relatively soon after franchise statutes had been adopted and subsequent decisions, even out of the Eastern District of Wisconsin, indicate that it would not be followed today. *See Swan Sales Corp. v. Joseph Schlitz Brewing Co.*, 126 Wis.2d 16, 374 N.W.2d 640 (App.1985); *Process Accessories Co. v. Balston, Inc.*, 636 F.Supp. 448 (E.D.Wis.1986); *Bimel–Walroth Company v. Raytheon Co.*, 796 F.2d 840 (6th Cir. 1986). The court agrees with the defendant, as the cases clearly indicate that the courts that have decided the issue in the last ten years have held that franchise statutes should not be given extraterritorial effect [21]. This decision is buttressed by the fact that giving Indiana's franchise statute extraterritorial effect raises Commerce Clause issues. Statutes are to be construed, if possible, to avoid raising constitutional questions. *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981); *Ind. Port Comm'n v. Bethlehem Steel Corp.*, 835 F.2d 1207 (7th Cir. 1988). Furthermore, there is no mandate in the Act to apply it extraterritorially. Thus, even if Wright–Moore were able to convince the court that it is a franchisee

**20.** *Ind. Code* § 23–2–2.7–1.

**21.** Having decided that the Indiana act does not apply extraterritorially, the court need not reach defendant's argument that an extraterritorial application of the act violates the Commerce

Clause of the United States Constitution. Thus, defendant's petition to certify existence of constitutional issue to the Attorney General of Indiana is denied.

under Indiana law and that the limitations on non-renewal apply to this case, the protection afforded by the act is limited to Wright–Moore's Indiana franchise territory.

■ Defendant next argues that the limitations on renewal in *Ind.Code* § 23–2–2.7–1(8) do not apply in this case because plaintiff never had an expectation of a renewal. Indiana's limitation on non-renewals is explicitly made inapplicable in certain circumstances. Specifically, the following sentence was added to *Ind.Code* § 23–2–2.7–1(8):

> This chapter shall not prohibit a franchise agreement from providing that the agreement is not renewable upon expiration or that the agreement is renewable if the franchisee meets certain conditions specified in the agreement.

Defendant argues that the Indiana act's limitation on non-renewal clauses was designed to preserve the reasonable expectations of the parties. Thus, if the franchise agreement provides for automatic renewals or otherwise indicates renewals will be forthcoming, thereby creating an expectation of renewal, the statute prohibits non-renewals without good cause. However, if the agreement provides it is non-renewable or renewable only if the franchisee meets certain conditions, thereby creating no expectations of renewal, the agreement is enforceable as written.

Defendant points out that the Distributorship Agreement entered into between Ricoh and Wright–Moore has a provision relating to the term of the Agreement. Article 9(a) of the Agreement provides as follows:

> This Agreement shall commence as of the date hereof and, unless earlier terminated as provided herein, shall continue in effect for an initial period of one (1) year. Thereafter, this Agreement may be renewed for additional one (1) year periods by written agreement of both parties at least sixty (60) days prior to the expiration of the initial term or any annual renewal term.

Defendant admits that Article 9(a) provides for the possibility of renewals, but argues that it does not provide for mandatory renewals or renewals which occur automatically. Defendant concludes that the language of the Agreement is no different than a provision simply stating that the contract was not renewable upon expiration, and, under the language of Article 9(a), the parties had to explicitly agree to the renewal, which is the exact same requirement that would apply if the Agreement simply specifically stated it was non-renewable.

Defendant further argues that Mr. Wright has essentially admitted that the contractual language gave him no expectation of a long-term arrangement. In fact, Mr. Wright specifically asked Ricoh for a longer term contract but his request was rejected [22].

■ Plaintiff counters with the argument that the court should endorse a very strict, literal reading of *Ind.Code* § 23–2–2.7–1(8). According to the plaintiff, the "good cause" requirement does not apply if the franchise agreement provides: (a) that it is not renewable upon expiration; or (b) that it is renewable if the franchisee meets certain conditions specified in the agreement. Plaintiff concludes that the Distributorship Agreement between plaintiff and defendant contains neither of these provisions and therefore the good cause requirement applies.

The court finds that plaintiff's construction and application of the statute to the case at bar is incorrect. First, the clear intent of the parties was for the Distributorship Agreement to not be automatically renewable, but to be subject to renewal by express agreement of the parties. Second, it must be remembered that when the Distributorship Agreement was entered into, the parties intended for it to be governed by New York law. Thus, the parties would not have written Article 9(a) so as to conform to a strict reading of an Indiana statute and the court will not now impose a strict construction of the statute on the defendant. Consequently, the court con-

**22.** Wright Dep. (I) at 234; Kane Dep. (I) at 17.

cludes that Ricoh did not have an obligation to renew the Agreement, and thus did not violate *Ind. Code* § 23–2–2.7–1(8) for any alleged failure to renew without good cause or in bad faith. Accordingly, the court will grant summary judgment for Ricoh on the issue of wrongful non-renewal of the Distributorship Agreement.

### E. Breach of Credit Terms (Substantial Modification)

In Count III of its complaint, plaintiff alleges that the defendant breached the contract between the parties. Specifically, Count III alleges that "pursuant to the terms of the letter agreement between the parties, plaintiff properly exercised its option in January 1985 to purchase an additional 3,000 copiers" but that "defendant has shipped only approximately 1,000 of the copiers ordered under the letter agreement...."[23] Under the terms of the July 23, 1984 letter agreement, defendant agreed to sell Wright–Moore 1,200 machines under special payment terms of 15% down and six months to pay the balance. Other special terms were incorporated as well. The letter agreement also gave Wright–Moore the option to purchase additional machines on the same terms until January 30, 1985. When Wright–Moore, however, attempted to exercise that option, defendant refused to sell the machines under the specific credit terms and instead insisted on cash in advance.

In this court's order of July 27, 1989 summary judgment was granted in favor of the defendant on this issue. The court held:

> Under the distributorship agreement, the terms of sale of copiers were subject to unilateral change by Ricoh as it saw fit. In Article 2(b) of the distributorship agreement, Ricoh reserved the right "to change its prices and terms of sale of the products at any time without prior notice to the distributor." Under that agreement, Ricoh's right to change the terms of sale was unfettered. Thus, when the two contemporaneously executed agree-

ments are construed together, it is clear that plaintiff's option to purchase additional copiers was limited by Ricoh's reservation of right to change the terms of sales of the copiers.

> July 27, 1989 Order at 41.

On appeal to the Seventh Circuit, the Court did not reach this issue, because the Court concluded that, if the Distributorship Agreement was an Indiana franchise, then one provision of the Indiana Deceptive Franchise Practices Act might apply to Article 2(b). The Seventh Circuit noted that *Ind. Code* § 23–2–2.7–1(3) provides that it is unlawful for a franchise contract to allow "substantial modification of the franchise agreement by the franchisor without the consent in writing of the franchisee." Thus, the Seventh Circuit remanded this issue for further development of the record[24].

Assuming that the Distributorship Agreement constitutes an Indiana franchise agreement, defendant argues that *Ind. Code* § 23–2–2.7–1(3) has no application to the present case. Defendant contends that the agreement which plaintiff claims was "substantially modified" through the change in credit terms was not the agreement which plaintiff claims to constitute the franchise agreement, *i.e.*, the Distributorship Agreement, but that the change was addressed to an option agreement entered in January of 1985. Defendant concludes that any "modification" was not to the claimed "franchise agreement" but to purchase orders generated later and, as a matter of law, such a modification was not contrary to *Ind. Code* § 23–2–2.7–1(3). Plaintiff has not responded to this argument. However, the court has already ruled that the Distributorship Agreement and the letter agreement are to be read together. The terms of the later option agreement were set out in the letter agreement, and it is the letter agreement, rather than the option agreement, that gives rise to plaintiff's claim of breach of contract terms. Thus, any modification, substantial

---

**23.** Complaint, ¶ 58.

**24.** *Wright–Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 140 (7th Cir.1990).

or otherwise, of the credit terms necessarily constituted a modification of the Distributorship Agreement, which is assumed to be a franchise agreement.

Defendant next argues that assuming that *Ind. Code* § 23-2-2.7-1(3) applies, the "modification" in this case was not "substantial." Defendant claims that a "substantial modification" is one which has a substantial adverse effect on a franchisee's competitive position [25], and argues that in this case there is no evidence that the change in credit terms had any adverse effect on Wright-Moore or Wright-Moore's competitive position. First, defendant contends that Ricoh compensated Wright-Moore for the change in credit terms by providing Wright-Moore with an additional 5½% discount, plus an 8% rebate which was changed to a discount off the price itself, for a total additional discount of 13½%. In his deposition, Jack Wright was asked to identify a specific hardship which the change in credit terms caused to plaintiff. Mr. Wright was unable to do so, stating at one point that he didn't know if the change caused Wright-Moore any harm [26]. Mr. Wright further testified that the reason he didn't buy the machines under the cash terms with the additional discounts was "the principle of it." [27] Defendant concludes that there was not a substantial change in credit terms, in violation of *Ind. Code* § 22-2-2.7-1(3), since the change in terms did not cause plaintiff any "adverse effects" as Mr. Wright was unable to point to any harm at all to Wright-Moore [28].

Plaintiff argues that since the question of whether a breach of a franchise contract is a jury question, the question of whether a change in a contract is "substantial" is also a jury question. Plaintiff also argues that whether Wright-Moore acted reasonably to mitigate its damages is also a question of fact and thus the issue of breach of credit terms is inappropriate for summary judgment. Plaintiff further claims that there is a dispute as to whether plaintiff had the cash or credit lines available to make the purchase of the remaining machines. Specifically, plaintiff points out that in August of 1985 (the time period in which plaintiff was to purchase the additional machines) it had a current liability, in the form of a note payable to the bank, of $857,068, and total current liabilities of $1,316,054. Plaintiff summarily concludes that there is an obvious factual issue as to plaintiff's ability to pay cash for additional machines, costing approximately $2.3 million, under these circumstances.

However, plaintiff's reference to its August 1985 balance sheet does not negate Mr. Wright's statement that he was not going to say that he didn't order the machines because he didn't have the credit, but that it was the principle of the issue [29]. Although plaintiff may very well have had a large current liability owing to the bank this does not constitute evidence that plaintiff was unable to obtain favorable credit terms for the purchase of the machines. Plaintiff has merely shown that it did not wish to purchase the machines on cash, not that it suffered any harm by Ricoh's change in the credit terms. The court fails to see how plaintiff expects to prove to a jury that Ricoh violated the Indiana act by causing a "substantial modification" of the franchise agreement without Wright-Moore's consent. Plaintiff has not come forward with any evidence of harm, loss, or adverse effect on its business as a result of the change in credit terms. Consequently, the court holds, as a matter of law, that the change in credit terms was not a substantial modification of the Distributorship Agreement.

Plaintiff, as part of its response to defendant's motion for summary judgment on plaintiff's claim for breach of the credit

---

25. *See Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc.,* 846 F.2d 1095 (7th Cir. 1988); *Remus v. Amoco Oil Co.,* 794 F.2d 1238 (7th Cir.1986).

26. Wright Dep. (II) at 780.

27. *Id.* at 2017-18.

28. *Fleet Wholesale Supply Co., Inc. v. Remington Arms Co., Inc.,* 846 F.2d 1095 (7th Cir.1988); *Remus v. Amoco Oil Co.,* 794 F.2d 1238 (7th Cir.1986).

29. Wright Dep. (II) at 2017-18.

terms of the letter agreement, argues that if plaintiff is a franchisee, then the defendant's failure to deliver the balance of the machines ordered was a violation of *Ind. Code* § 23–2–2.7–2(2) which provides:

It is unlawful for any franchisor who has entered into any franchise agreement with a franchisee who is either a resident of Indiana or a nonresident operating a franchise in Indiana to engage in any of the following acts and practices in relation to the agreement:

\* \* \* \* \* \*

(2) Refusing or failing to deliver in reasonable quantities and within a reasonable time after receipt of an order from a franchisee for any goods, supplies, inventories, or services which the franchisor has agreed to supply to the franchisee, unless the failure is caused by acts or causes beyond the control of the franchisor.

Defendant, in reply, claims that this court in its order of July 27, 1989, entered summary judgment against plaintiff on this statutory claim and thus the claim is barred by *res judicata*. First, it is clear that plaintiff raised this claim in its complaint. See Complaint, Count II, at ¶ 55. Second, it is clear that this court granted defendant summary judgment on this claim as the plaintiff did not produce sufficient evidence on this claim to justify submitting its claim to a jury. See Order at 39–40. Third, the Seventh Circuit did not reverse this court's grant of summary judgment on this claim, nor did it remand for further evidence on this issue. Consequently, this court agrees with the defendant that plaintiff is now barred from raising its claim under *Ind. Code* § 23–2–2.7–2(2).

■ Finally, plaintiff puts forth the argument that even if plaintiff is not a franchisee, the contract for the sale of additional machines was a contract for the sale of goods governed by the Uniform Commercial Code and there is a question of fact as to whether the defendant acted in good faith in unilaterally altering the credit terms. Defendant disputes the application of the UCC to this case, and contends that it changed the terms of the sale of ma-

chines in good faith, because the plaintiff was the source of very serious credit concerns at Ricoh. The evidence clearly shows that Ricoh had reason to be concerned about extending further credit to plaintiff. First, plaintiff had previously provided a false and misleading credit application to Ricoh, misrepresenting plaintiff's annual sales by approximately $3.3 million and claiming a $250,000 credit line with its own "shell" corporation, Summit Business Systems. Second, the evidence clearly shows that Ricoh had in its possession Wright–Moore's August 31, 1984 financial statements and had expressed concern over Wright–Moore's credit position. In fact, an interoffice memo suggested that Ricoh should obtain a letter of credit from Wright–Moore and also explore the possibility of obtaining a personal guarantee from Mr. Wright and his wife. For these reasons, the court finds plaintiff's claim under the UCC to be without merit.

### III. Damage Claims

#### A. Consequential and Other Damages

■ Defendant has filed a motion for summary judgment with respect to plaintiff's claims for consequential and other damages. Defendant characterizes its motion as follows:

Specifically, Ricoh moves that the Court enter an order barring any award of consequential damages arising out of the alleged "wrongful termination of the Distributorship Agreement", including any "loss of dealers" and "lost sales" to dealers, any recovery of lost profits, lost good will, loss of the "value of its business," and "loss of future profits." Furthermore, with respect to Plaintiff's claim of breach by Defendant of an agreement to sell a specific quantity of copiers to Plaintiff, Defendant seeks an order barring any award of consequential damages, including any claimed lost profits on the sale of such copiers, and claimed lost profits on the sale of associated parts and supplies.

Ricoh's Brief in Support of Summary Judgment, filed Sept. 13, 1991, at 1.

Assuming that Wright–Moore is a franchisee and that Ricoh violated the franchise act by not renewing the Distributorship Agreement, the court finds that as a matter of law, plaintiff is entitled to lost future profits for a reasonable length of time. *Kealey Pharmacy and Home Care Services, Inc. v. Walgreen Co.*, 761 F.2d 345 (7th Cir.1985); *Joseph Schlitz Brewing Co. v. Central Beverage Co.*, 172 Ind.App. 81, 359 N.E.2d 566 (1977). Even the case relied upon by the defendant to support its argument that plaintiff is limited to contractual damages allowed the franchisee to recover for lost profits. *See Hoai v. Sun Refining & Marketing*, No. 87–2456, 1991 WL 197036 (D.D.C.1991). Plaintiff, in its complaint, has claimed as damages (1) lost profits, (2) loss of good will, and (3) destruction of a substantial part of its business. There is no authority in the area of franchise law which prohibits plaintiff from recovering these damages, assuming it can prove its case and then prove its damages [30].

The court acknowledges *First National Bank of Logansport v. Logan Manufacturing Co., Inc.*, 577 N.E.2d 949 (Ind.1991), in which the Indiana Supreme Court, ruling on plaintiff's promissory estoppel claim, limited plaintiff's damages to reliance damages as justice did not require an award of lost profits. However, this case does not support defendant's theory that it is entitled to a ruling, at the summary judgment stage, that plaintiff has no basis to seek lost profits as an element of its damages. If the jury should award damages to plaintiff that are clearly unjustified by the evidence, defendant is permitted to petition the court for remittitur of the damage award. Consequently, defendant's motion for summary judgment on plaintiff's claim for consequential and other damages will be denied.

## B. Punitive Damages

In Count VIII of its complaint, plaintiff alleges that the misconduct of the defendant was malicious and oppressive and that therefore it is entitled to punitive damages. Count VIII provides:

76. Plaintiff incorporates the allegations of rhetorical paragraphs 1 through 75 above as if fully set out herein.

77. Defendant's foregoing breaches of contract were malicious and oppressive, and the public interest would be served by an award of punitive damages. Defendant allowed plaintiff to invest time, money and effort in recruiting and training dealers to sell and service Ricoh machines even after defendant had secretly determined to terminate the plaintiff. Defendant did so with the knowledge that after plaintiff was terminated, defendant and its favored distributors could appropriate for themselves the dealers and trained service employees which Wright–Moore had recruited and trained at its own expense. Defendant and/or co-conspirators also actively interfered with plaintiff's contractual relations with its dealers by coercing and threatening them to cease purchasing from plaintiff and to purchase instead from Ricoh or its favored distributors. For all of the above reasons, punitive damages are appropriate in this case to punish the defendant and to deter it and others from similar oppressive and malicious conduct in the future.

In this court's order of July 27, 1989, the court held the following with respect to plaintiff's punitive damages claim:

[P]laintiff bases its punitive damage claim on its breach of contract claims as contained in Counts III and IV. Because plaintiff has failed to forward any facts which would survive defendant's motion for summary judgment on those or any other counts, it is clear that plaintiff cannot recover punitive damages.

July 27, 1989 Order at 50.

The Seventh Circuit on appeal did not reach the question of punitive damages. 908 F.2d at 142 n. 7. Defendant has now renewed its motion for summary judgment

---

**30.** *See also Sheldon v. Munford, Inc.*, 950 F.2d 403, 408–411 (7th Cir.1991), in which the Seventh Circuit Court of Appeals, applying Georgia law, upheld an award of damages for lost future profits although the Court concluded that the computation of damages was erroneous, thereby entitling defendant to a new trial unless plaintiffs accepted a remittitur.

on the issue of punitive damages, taking the position that even assuming that plaintiff was a franchisee, there is no evidentiary basis upon which punitive damages could be assessed against defendant Ricoh under Indiana law.

Plaintiff, however, puts forth the argument that there is clear and convincing evidence that defendant intentionally interfered with one of its dealers, CopyRite, and intentionally induced the breach of plaintiff's contract with CopyRite. Plaintiff additionally argues that there is clear and convincing evidence that defendant reneged on its promise to sell 3,000 copiers to the plaintiff, in violation of the parties' contract, as well as the Indiana franchise statutes.

First, addressing plaintiff's claim of intentional interference with contract, the court notes that the elements of this tort are: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages. *Neterer v. Slabaugh*, 548 N.E.2d 832 (Ind.App.1990). Plaintiff relies heavily on the affidavit of Donald J. Dudine, the Vice President of CopyRite, Inc., to establish the existence of the five elements. Dudine's affidavit states in pertinent part:

8. After Ricoh's assurances, Mr. Head and I confirmed with Jack Wright that CopyRite would like to enter into a dealership contract with Wright–Moore, and the Dealer Agreement was signed as of the 28th day of August, 1984, a copy of which is attached as Exhibit "A".

9. Thereafter, Wright–Moore trained CopyRite's service personnel on the 3000, 4000, and 5000 series of Ricoh copy machines in Fort Wayne, Indiana, and Copy-Rite then was permitted to purchase and began purchasing the Ricoh line of machines from Wright–Moore and thereafter enjoyed a very good working relationship with Wright–Moore.

10. This very good working relationship existed until CopyRite was contacted by Les Green, a representative of Ricoh, in the fall of 1985, and the representative of Ricoh requested a meeting with Copy-Rite. The meeting with the representatives took place in the fall of 1985, probably some time in October.

11. I attended the meeting with Les Green in October of 1985, and I was told it would be in CopyRite's best interests to become an authorized Ricoh dealer and bypass Wright–Moore. I told the Ricoh representative that CopyRite had a dealer contract with Wright–Moore and was well satisfied with the relationship, and I was concerned about the contractual relationship. However, I was told that CopyRite should purchase direct from Ricoh.

12. As a result of this meeting with the Ricoh representative, CopyRite followed Ricoh's direction and in the fall of 1985 became a direct Ricoh dealer and entered into a dealership contract with Ricoh and discontinued buying Ricoh machines from Wright–Moore, and began purchasing all of its Ricoh machines directly from Ricoh....

Plaintiff thus claims that all of the elements of the tort of interference with contract are present in this case as plaintiff had a valid and enforceable contract with CopyRite, CopyRite informed Ricoh of its contract with plaintiff when Ricoh approached CopyRite to solicit it as a direct dealer, but Ricoh nevertheless induced CopyRite to breach its contract with plaintiff with such knowledge, Ricoh had no justification to induce the breach, and plaintiff suffered damages because CopyRite stopped purchasing Ricoh products from plaintiff [31].

---

31. It is important to note that although Copy-Rite did not purchase any copy machines from Wright–Moore after Ricoh personnel contacted CopyRite and suggested that it bypass Wright–Moore, CopyRite did not terminate its Dealer Agreement with Wright–Moore at that time. Rather, at the expiration of the Dealer Agreement, CopyRite simply chose to not renew the Agreement. CopyRite's request to not renew the Agreement was honored by Wright–Moore, and effective September 13, 1986, CopyRite was no longer an authorized Ricoh dealer under the Wright–Moore distributorship program. See Dudine Aff., Ex. B.

Defendant rejoins with the argument that plaintiff has failed to present sufficient evidence to support its claims. First, defendant contends that plaintiff has failed to present evidence that CopyRite breached its contract with plaintiff. Although plaintiff bases its argument on a "best efforts" provision in the contract between plaintiff and CopyRite, defendant maintains that the "best efforts" clause has no meaning and could never be enforced and, therefore, the provision could never have been breached.

The Dealer Agreement between plaintiff and CopyRite was entered into on August 28, 1984 for a term of two years subject to be renewed by agreement by the parties for additional two-year periods. The Agreement provided in part:

1. APPOINTMENT

Wright–Moore hereby appoints Dealer and Dealer accepts as Wright–Moore's non-exclusive dealer for the products distributed and/or sold by Wright–Moore (hereinafter collectively called "Products").

\*    \*    \*    \*    \*    \*

2. BEST EFFORTS

Dealer agrees to promote the goodwill and name of Wright–Moore and to do everything within its capacity to further the interest of Wright–Moore. Dealer undertakes and agrees to purchase and sell to customers situated within the Territory Products having a value determined by the amount invoiced to Dealer by Wright–Moore of Dealer's annual sales quota assigned by Wright–Moore. The initial sales quotas for the Products are set forth in Attachment B.

Dealer Agreement at 1, 2.

Although the Agreement called for an annual sales quota, CopyRite was never assigned a sales quota and Jack Wright testified that he never enforced a sales quota on his dealers[32]. Furthermore, the Agreement specifically provides that CopyRite was a "non-exclusive dealer" and Jack Wright testified that his dealers could deal directly with anyone[33]. Clearly, the "best

efforts" provision is too indefinite to be enforced under Indiana law. "It is fundamental contract law that a contract is unenforceable if it is so indefinite and vague that the material provisions cannot be ascertained." *Pepsi–Cola General Bottlers, Inc. v. Woods*, 440 N.E.2d 696, 699 (Ind.App.1982). Plaintiff would not have been able to maintain a suit against CopyRite for breach of the contract, as it would have been impossible for a court to determine the meaning of the "best efforts" clause. Plaintiff cites *Donavan v. Ivy Knoll Apts. Partnership*, 537 N.E.2d 47, 53 (Ind.App.1989), in support of its position that the "best efforts" clause is not too indefinite to be enforced since a reasonable and logical interpretation of the clause would require CopyRite to "promote products it would purchase from Wright–Moore." However, the clause does not require CopyRite to purchase products from Wright–Moore and the clause cannot be used to extract punitive damages from Ricoh merely because Ricoh persuaded CopyRite to bypass Wright–Moore and purchase its copiers directly from Ricoh. As CopyRite did not breach the Dealer Agreement, defendant cannot be liable for intentional interference with contract.

Plaintiff next claims that it is entitled to an award of punitive damages based on defendant's exhibition of bad faith by unilaterally changing the credit terms on its agreement to sell 3,000 copiers to the plaintiff. Plaintiff contends that a jury could find, by clear and convincing evidence, that the stated reason for defendant's unilateral refusal to honor the previously agreed-upon credit terms—an alleged concern over Wright–Moore's credit—was pretextual.

Assuming that defendant's act of changing the credit terms violated *Ind.Code* § 23–2–2.7–1(3), to recover punitive damages plaintiff must offer clear and convincing evidence at trial that the defendant acted with malice, fraud, gross negligence, or oppression and some evidence inconsistent with the hypothesis that [de-

**32.** Wright Dep. (I) at 90–91.

**33.** Wright Dep. (I) at 135.

fendant's] tortious conduct was merely the result of mistake of law or fact, honest error of judgment, overzealousness, mere negligence or other such noniniquitous human failing. *Orkin Exterminating Co. v. Traina* (1986), Ind., 486 N.E.2d 1019, 1023; *Bud Wolf Chevrolet, Inc. v. Robertson* (1988), Ind., 519 N.E.2d 135, 137.

*Eden United, Inc. v. Short,* 573 N.E.2d 920 (Ind.App.1991). To defeat summary judgment plaintiff must present the court with evidence sufficient to show that a jury could reasonably find for plaintiff on the issue of punitive damages.

In support of its claim that the defendant acted in bad faith in that its alleged concern over plaintiff's credit position was pretextual, plaintiff presents the affidavit of Jack Wright which states in part:

2. Prior to receiving Ricoh's letter of July 29, 1985 ... Wright–Moore had not been asked by Ricoh for any credit information. ...

\*   \*   \*   \*   \*   \*

4. [I]n a meeting at Wright–Moore in Fort Wayne in June 1985 at which Ricoh's credit manager was present, Steve Mann asked the credit manager if he would like to see any credit documents or would like to meet with our Controller, Mr. Mertens, to get additional credit information. The credit manager declined the offer and said he did not need any information.

5. To the best of my knowledge Ricoh never asked for or received any additional credit information from Wright–Moore between the time of our purchase of $1.7 million worth of copiers under the credit terms of the July 23, 1984 Letter Agreement, and the time that Ricoh began to insist on cash in advance.

Wright Aff. at ¶¶ 2, 4–5.

Plaintiff further presents evidence that on or about July 1985 Ricoh listed as its first goal on its business plan to eliminate Wright–Moore as regional distributor[34]. Also, plaintiff's evidence shows that as early as January 1985 Ricoh was under pressure from other Ricoh dealers to terminate Wright–Moore's distributorship[35]. Plaintiff concludes that this evidence is sufficient to support an award of punitive damages under Indiana law, citing *Miller Brewing Co. v. Best Beers of Bloomington,* 579 N.E.2d 626 (Ind.App.1991), and *Joseph Schlitz Brewing Co. v. Central Beverage Co., Inc.,* 172 Ind.App. 81, 359 N.E.2d 566 (1977), which held that, under Indiana statute relating to unethical terminations of distribution agreements between brewer and beer wholesaler, to be valid the reason for termination must be genuine and not mere subterfuge.

As noted earlier in connection with defendant's motion for summary judgment on the issue of breach of the credit terms, the evidence overwhelmingly shows that defendant had good reason to be concerned about extending further credit to plaintiff due to an inspection of Wright–Moore's August 31, 1984 financial statements and the fact that Wright–Moore had previously provided a false and misleading credit application to Ricoh.

Since the ultimate issue here is whether punitive damages could be found to be appropriate the court must consider the assumed statutory violation in light of Ricoh's contractual rights and the purposes of imposing punitive damages. This court has held, and the Seventh Circuit did not rule otherwise, that Ricoh had an unfettered contractual right to change the terms of sale. Even assuming that this change constituted a "substantial modification" and thereby violated the franchise act, there is simply no basis for imposing punitive damages upon the defendant. Under Indiana law, a party's exercise of his rights under a contract cannot supply grounds for punitive damages. *First Federal Savings & Loan Ass'n v. Mudgett,* 397 N.E.2d 1002, 1008 (Ind.App.1979). The Seventh Circuit recently held that a party may not be accused of wrongdoing in relying upon a plausible interpretation of its contract rights. *R.S. & V. Co. v. Atlas Van Lines,*

---

**34.** Ivy Dep. at 251–55, Ex. 13.

**35.** Donatelli Dep. at 99–120.

*Inc.*, 917 F.2d 348, 353 (7th Cir.1990). Also, it must be remembered that the defendant intended for New York law to apply to the contract, and its actions which could have caused the assumed statutory violation at least arguably constituted a mistake of law, which cannot give rise to a claim for punitive damages. *Miller v. Farmers Ins. Group*, 560 N.E.2d 1261, 1262–63 (Ind.App.1990).

Consequently, this court holds that plaintiff has not met its burden of showing that there is a genuine issue of material fact with respect to punitive damages and, further, defendant's actions were taken in reliance on the language of a valid contract and cannot, as a matter of law, provide the basis for punitive damages. Accordingly, defendant's motion for summary judgment on plaintiff's claim for punitive damages will be granted [36].

### IV. Bifurcation

Finally, for the sake of completeness, the court will assume defendant has not prevailed on its motion for summary judgment on the franchise issues and will consider defendant's motion to bifurcate the franchise issues and submit them for a bench trial.

Defendant claims that the threshold issue of whether the Distributorship Agreement is an Indiana "franchise" must be determined by the court and not by a jury, as a matter of federal law. Specifically, the defendant contends that the issue before the court is one of contract interpretation, that Wright–Moore is requesting the court for reformation of a contract, and that the measure of damages which applies in this case is restitutionary and equitable and is therefore addressed to the discretion and judgment of the court.

The court will first address defendant's argument that the question of whether the Distributorship Agreement constitutes a franchise is a question of law, properly resolved by the court and not the jury. Defendant claims that the Seventh Circuit, in *Hoosier Penn Oil Co. v. Ashland Oil*

*Co.*, 934 F.2d 882 (7th Cir.1991), effectively held that whether an agreement is a franchise agreement is a "law" question. Admittedly in *Hoosier Penn* the Seventh Circuit did uphold the district court's grant of summary judgment in favor of the defendant on the franchise issue. However, just because the Seventh Circuit upheld the district court's determination that plaintiff, as a matter of law, was not a franchisee, does not mean that the Seventh Circuit was ruling that the franchise issue is a "law" question in every case. Clearly, the purpose of summary judgment motions is to weed out claims, such as those in *Hoosier Penn*, that the plaintiff does not have sufficient evidence to warrant submission to the jury. Moreover, the Seventh Circuit in this case stated that the existence of a franchise is very "fact specific". *See also Cassidy Podell Lynch, Inc. v. SnyderGeneral Corp.*, 944 F.2d 1131 (3d Cir.1991); *Colonial Ford, Inc. v. Ford Motor Co.*, 577 F.2d 106 (10th Cir.1978).

Defendant also puts forth the argument that the common experience of jurors is too limited to permit them to decide "technical" franchise questions. This argument has no merit as jurors routinely apply technical laws to complex fact patterns. Defense counsel can avoid jury confusion by presenting the facts to the jury in a straightforward manner, and by preparing and submitting clear, concise, and complete jury instructions.

Defendant also advances the peculiar argument that the court should decide the franchise issues because "consistency, uniformity and predictability here are important to the administration of the underlying laws" as the franchise statutes regulate contractual relations in a commercial context. The court fails to see how uniformity and predictability are more important in the area of contract law than, for example, in criminal law or in products liability law. The legal system has its own means of voiding jury verdicts that are clearly erroneous and there is no need to deprive plain-

---

**36.** In light of this ruling, defendant's argument that the Indiana statute which allows the grant of punitive damages is unconstitutional need not be reached.

tiffs of a jury trial simply because their case is technical.

Defendant next argues that plaintiff must obtain a reformation of the Distributorship Agreement before it can seek damages, and whether the Agreement should be reformed is an issue for the court. Specifically, defendant contends that plaintiff cannot seek damages unless the court first rules that the provision in the Agreement allowing non-renewal was unlawful and, further, that no injury or damages can flow from the mere existence of an allegedly "unlawful" provision in a contract which is alleged to be a franchise agreement.

Plaintiff, however, repeatedly insists that it is not seeking reformation, which is a remedy used to correct a mistake in the expression of the parties' agreement, but is seeking monetary damages for wrongful non-renewal of its franchise agreement.

The Indiana statute governing damages in franchise actions, *Ind. Code* § 23–2–2.7–4, provides as follows:

> Any franchisee who is a party to a franchise agreement entered into or renewed after July 1, 1976 which contains any provision set forth in Section 1 of this chapter or who is injured by an unfair act or practice set forth in Section 2 of this chapter may bring an action to recover damages, or reform the franchise agreement.

The obvious intent of the statute is to permit an injured party to sue for damages for violation of either Section 1 or Section 2, or to bring an action to reform the franchise agreement. Defendant attempts to persuade the court that the legislature intended for reformation to be the only remedy for violations of Section 1, and for damages to be the available remedy for violations of Section 2. However, the statute does not specifically limit the remedy available for violations of Section 1 to reformation and if the legislature had intended to so limit the remedies available, it could have easily done so. The court will give the statute its obvious meaning and holds that plaintiff is entitled to seek damages for violations of Section 1 of the Deceptive Franchise Practices Act.

Finally, defendant argues that plaintiff is only entitled to restitution, an equitable remedy, and thus the franchise issues should be tried to the bench. However, this court has already determined, in connection with defendant's motion for summary judgment on plaintiff's claim for consequential damages, that plaintiff is entitled seek to recover its lost future profits and is not limited to restitutionary damages. To limit plaintiff to restitutionary damages for violation of *Ind. Code* § 23–2–2.7–1(8), which prohibits provisions permitting a franchisor to fail to renew a franchise without good cause or in bad faith, would render the statute ineffective. Consequently, defendant's motion to bifurcate the franchise issues for a bench trial will be denied.

## V. Conclusion

For the foregoing reasons, defendant's motion for summary judgment on the claims for consequential and other damages and defendant's motion to bifurcate the franchise issues for a bench trial are hereby DENIED. Defendant's motions for summary judgment on the franchise issues, the claim for wrongful non-renewal, the claim for breach of credit terms, and the claim for punitive damages are hereby GRANTED.

In light of the fact that the court has granted defendant's motions for summary judgment on the franchise issues, the claim for wrongful non-renewal, the claim for breach of credit terms, and the claim for punitive damages, this action is hereby DISMISSED.