917 F.2d 348
 R.S. & V. COMPANY, formerly known as Rothery Storage & Van
Company, Plaintiff-Appellant, Cross-Appellee,
v.
ATLAS VAN LINES, INCORPORATED, Defendant-Appellee,
Third-Party-Plaintiff-Appellee, Cross-Appellant,
v.
TRANSWORLD VAN LINES, INCORPORATED,
Third-Party-Defendant-Appellee, Cross-Appellee.
 Nos. 89-1290, 89-1404.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 28, 1990.
Decided Nov. 6, 1990.
 
 C. Jack Pearce, Milton J. Grossman, Washington, D.C., Arnold D. Goldstein, Patrick D. Lamb, Goldstein & Lamb, Chicago, Ill., for plaintiff-appellant, cross-appellee.
 Barbara S. Steiner, Donald R. Sampen, Theodore Tetzlaff, Randall F. Kender, Jenner & Block, Chicago, Ill., for defendant-appellee, third-party-plaintiff-appellee, cross-appellant.
 Before POSNER and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.
 POSNER, Circuit Judge.
 
 
 1
 This appeal and cross-appeal arise out of a suit for breach of contract that the district judge resolved, largely in the defendant's favor, on summary judgment. The parties agree that Illinois law governs the substantive issues in this diversity suit, but as a matter of fact no esoteric doctrines of Illinois law are invoked, only the general common law of contracts.
 
 
 2
 The plaintiff, named until recently Rothery Storage & Van Co. (and we shall continue to use that name), was for many years engaged in the household moving business in Chicago. Besides being a local mover, Rothery had been authorized by the Interstate Commerce Commission to provide interstate service over certain routes. Despite its possession of this interstate authority, it was greatly to Rothery's advantage to be affiliated with a national mover such as Atlas Van Lines, the defendant in this case. National movers such as Atlas function as networks and (in effect, not form) as franchisors of local movers. The network function is to coordinate movements in order to facilitate door-to-door service and backhauls, so that the vans do not run empty on return trips, and also to obtain and maintain comprehensive operating authority from the ICC. The franchisor function is to provide a common trade name in order to facilitate advertising and reassure consumers that they are dealing with a national rather than a purely local enterprise. (For further description of the system of national and local carriers in the household moving business see North American Van Lines, Inc. v. ICC, 666 F.2d 1087, 1094-95 (7th Cir.1981).)
 
 
 3
 Rothery first signed up with Atlas in the 1950s, but in 1967 the parties signed a superseding agency agreement which is the contract that Rothery claims Atlas broke. The agreement made Rothery an agent exclusively for Atlas. As agent, Rothery agreed to solicit and conduct business in Atlas's name at the rates fixed in Atlas's tariffs, and to remit the revenues to Atlas minus a commission to Rothery on each shipment. In exchange for this service Rothery obtained not only the use of Atlas's name but also the networking services that Atlas provided its agents. However, the agreement also reserved to Rothery the right to conduct business under its own operating authority, yet with full use of Atlas's name and other services--for nothing. This reservation made Rothery what is called a "carrier agent," and under a regulation that the ICC had promulgated in 1939 Rothery was required to charge the same rates for shipments made under its own operating authority as when shipping as Atlas's agent.
 
 
 4
 The agreement had two provisions relating to termination. The first provided that the agreement would remain in effect for one year from the date the agreement was signed, unless terminated for cause; the second that the agreement "shall be automatically renewed from year to year unless the Agent or Atlas shall terminate it by formal written notice sent by registered mail, which shall become effective upon receipt thereof."
 
 
 5
 The years passed uneventfully until, in 1979 and 1980, Congress enacted statutes that greatly loosened the grip of regulation in the trucking industry. In the wake of these enactments, which among other things made it easier for moving companies to obtain additional operating authority, the ICC rescinded the regulation that had required carrier agents to charge their principals' rates even when operating under their own authority. North American Van Lines, Inc. v. ICC, supra, 666 F.2d at 1094-96.
 
 
 6
 The changes in the regulatory environment gave carrier agents, such as Rothery, an incentive to shift their business from the agency side of the ledger to the independent side, where they could set their own rates and enjoy Atlas's franchisor-type services without charge, and to obtain such additions to their operating authority as they might need in order to provide such independent service over lucrative routes.
 
 
 7
 Atlas responded to this threat to its business (for remember that it earned nothing on shipments by its agents when they were using their independent operating authority) in 1982 by announcing that it would not retain a carrier as an agent unless the carrier spun off its independent operating authority to a separate company that would not use the Atlas name or services. Atlas wrote each of its carrier agents to ask whether they intended to comply with the new policy. Rothery's response was to complain to the ICC and later to file an antitrust suit against Atlas (eventually dismissed, Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210 (D.C.Cir.1986)). When the ICC dismissed Rothery's complaint and the district court dissolved a temporary restraining order that the court had entered at the outset of the antitrust suit, Atlas wrote Rothery again, asking whether now it intended to comply with the new policy on carrier agents. Rothery's president replied: "I understand that the TRO is no longer in effect and [Rothery] will be initiating the process of compliance." Meanwhile Rothery had bought Transworld Van Lines, and in August 1983, three months after the letter from which we just quoted, Rothery transferred its ICC operating certificates to Transworld.
 
 
 8
 Relations between Atlas and Rothery went from bad to worse and on July 2, 1985, Atlas notified Rothery that it was terminating their contract effective September 30, 1985, which happened to be six days before the eighteenth anniversary of the signing of the contract. This lawsuit followed. Rothery charges Atlas with two breaches of contract: first, the imposition in 1983 of the new policy on carrier agents, a policy inconsistent with the reservation in the contract of Rothery's right to operate as an independent carrier with full use of Atlas's name and services without charge; second, the termination of the contract six days short of the anniversary, Rothery's interpretation of the second termination provision being that it permits termination only on anniversaries. The district judge, on cross-motions for summary judgment, agreed with Rothery's interpretation of the termination provision. But with respect to the first alleged breach, the 1983 imposition of the altered carrier policy, the judge said that "the fact that Atlas made threats of termination which it did not carry out for a long period of time does not render Atlas liable for a breach of contract until it in fact followed through and terminated the contract slightly prematurely and without cause." He concluded that Rothery was entitled only to six days' worth of damages, a trivial amount which happened to be offset by money owed Atlas by Rothery, the subject of a counterclaim. So Rothery got nothing, and has appealed, while Atlas has cross-appealed, contending that the contract was terminable at will, so that there was no breach--not even for six days. We shall take up this issue first.
 
 
 9
 Were there no reference to the contract's being automatically renewed from year to year, Atlas's interpretation of the termination clause would be compelling; the contract would be terminable upon Rothery's receipt of Atlas's notice of termination. If this seems abrupt, Atlas points out that the contract gives Rothery thirty days after termination to discontinue the use of Atlas's trademarks and otherwise wind up the agency relationship in an orderly manner. But if we accept Atlas's interpretation, what are we to make of the statement that the agreement "shall be automatically renewed from year to year"? Renewed from year to year means renewed for a year at a time, and since the initial contract term was a year it would hardly be surprising if the parties had provided for successive one-year terms. It is true, although contrary to the mythology of contractual interpretation, that some contracts contain surplus language. (For a rare judicial acknowledgment of this point, see North Gate Corp. v. National Food Stores, Inc., 30 Wis.2d 317, 323, 140 N.W.2d 744, 748 (1966).) But it would be strange if the parties had meant nothing when they said the contract would be automatically renewed from year to year. And yet the district judge's interpretation can hardly be though inevitable, when we consider the last words of the provision, "effective upon receipt thereof." If the contract was renewable for yearly terms, it could be terminated only on October 6 of each year, and not on whatever date Rothery should happen to receive a notice of termination. Usually when a contract is terminable on a specified date, the contract also specifies a date before then by which notice of termination must be sent or received. If the automatic-renewal provision in the agency agreement is not surplusage, the effective-upon-receipt provision is, and vice versa.
 
 
 10
 The provision, then, is ambiguous, and the usual approach to an ambiguous contract is to admit testimony by the draftsmen and other evidence that might help to disambiguate it. Clinton v. Moffitt, 812 F.2d 341, 344 (7th Cir.1987). This is not a promising course here, since the contract was drafted more than two decades ago.
 
 
 11
 Fortunately we can leave the meaning of the provision unresolved. Although styled a cross-appeal, Atlas's submission with regard to the terminability of the contract is really an alternative ground for upholding the district judge's bottom line, which was zero damages. For while in principle Atlas would be entitled to damages on its counterclaim if it could knock out Rothery's six days' worth of damages, Atlas very sensibly has waived its claim to those damages--$16,000, a sum not worth fighting over, given the expense of litigating in federal courts nowadays. This means that if we hold--and we shall hold--that the imposition of the policy change on Rothery in 1983 was not a breach of contract, the question whether the contract was terminable at will is moot, since Rothery is not seeking nominal damages, a remedy to which the victim of a breach of contract is entitled even if he proves no actual damages. Olympia Hotels Corp. v. Johnson Wax Development Corp., 908 F.2d 1363, 1372 (7th Cir.1990).
 
 
 12
 Turning, then, to the second issue, that of the alleged breach in 1983 or at least precipitated by events in that year, we do not understand what the district judge meant when he said that Atlas's attempt in 1983 to force Rothery to spin off its independent operating rights ripened into a breach of contract only in 1985, when Atlas terminated the contract. Neither party defends this theory. We think it plain that Atlas's conduct was a breach of contract in neither year, and will merely register in passing our surprise that Atlas has not argued that in any event the judgment in its antitrust suit with Rothery is res judicata with regard to any effort to prove that a breach occurred back in 1983.
 
 
 13
 Ordinarily a breach of contract is either a repudiation of the contract by the alleged contract-breaker, or an act by him. Atlas did neither back in 1983 when it asked Rothery whether Rothery intended to comply with the new policy. It did not do anything; and it did not say that if Rothery failed to comply with the new policy, it (Atlas) would walk away from its contractual obligations. Of course implicit in its question about Rothery's intentions was a threat not to renew the contract if Rothery did not buckle under. But it is not a breach of contract to threaten to do something you have a perfect right to do. Stewart M. Muller Construction Co. v. New York Telephone Co., 40 N.Y.2d 955, 390 N.Y.S.2d 817, 359 N.E.2d 328 (1976) (per curiam). It is not at all the same thing as threatening to break the contract unless the other party gives you what you want. If as the term of a contract approaches its end you say to the other party that you will not renew unless the contract is changed in your favor, you are merely inviting negotiations for the next contract and it is precisely to reserve this kind of freedom of action that a contract is made terminable at definite intervals. We add, though unnecessarily because courts do not exercise a general ethical supervision over contract parties, that unforeseen changes in the economics of the household moving industry had dramatically shifted the balance of advantages in the agency agreement from Atlas to the carrier agents--had in fact created a situation in which Atlas was likely to receive little or no compensation for the extensive services that it provided these agents--and Atlas could hardly be expected to acquiesce passively when not contractually obligated to do so.
 
 
 14
 Does it make a difference that the contract was changed in response to a threat of nonrenewal made before the contract expired? We think not. The contract was not for a fixed term; it kept going until terminated. This meant that any change in its terms would be a change in an existing contract, or in other words a contract modification. In effect, and we think in law as well, the inquiry that Atlas directed to Rothery in 1983 was a proposal to modify the contract to change a term that had become irksome to Atlas because of changed circumstances brought about by the substantial deregulation of the trucking industry. Rothery, however reluctantly, consented to the modification. It did so because it feared that otherwise Atlas would terminate the contract as soon as it could do so without liability. But a perfectly expectable sequel to a refusal to agree to a proposed modification is the termination of the contract at the earliest time permitted by the contract.
 
 
 15
 Not all contractual modifications are enforceable, as we have had occasion to note recently. United States v. Stump Home Specialties Mfg., Inc., 905 F.2d 1117, 1121-22 (7th Cir.1990). The ordinary defenses to contracts, such as duress and want of consideration, are defenses to contractual modifications as well. Duress is not argued in this case and so far as consideration is concerned Atlas's forbearance to exercise its right to terminate the contract at the earliest possible opportunity was consideration enough to support the modification.
 
 
 16
 In this connection the "relational" character of this contract may usefully be noted. Goetz & Scott, Principles of Relational Contracts, 67 Va.L.Rev. 1089 (1981). The contract created (actually, modified) a relationship expected to last for many years. Since the future could not be foreseen, and indeed was to take an unexpected turn with the triumph of the deregulation movement, the draftsmen did not try to bind the parties to each other with iron fetters. The 1967 contract was not a marriage till death do us part. A contract is not illusory merely because it is terminable at will, or at periodic intervals, without liability. McKnight v. General Motors Corp., 908 F.2d 104, 109 (7th Cir.1990). Employment relationships are often long term and always contractual, but most employment contracts are terminable at will. The enforcement mechanism for such contracts, as explained in Epstein, In Defense of the Contract at Will, 51 U.Chi.L.Rev. 947 (1984), is what economists call bilateral monopoly. So long as the relationship is mutually beneficial, each party can by terminating it impose costs on the other (this is what it means to say the relationship is mutually beneficial), and this prospect is the cement of the relationship. And so it was with Rothery's contract with Atlas. So long as the relationship was mutually beneficial, it would endure; but not otherwise. When it ceased to confer advantages on Atlas, Atlas insisted on a modification to restore the mutuality of benefit, and it was Rothery's choice to accept the modification or end the relationship. It chose the former, and is bound by its choice.
 
 
 17
 If Atlas had threatened to terminate the contract before expiration--and a threat to terminate before October 6 of a year in or after which the threat was made might (or might not) be such a threat--then it might be guilty of duress, the civil counterpart to extortion, provided it knew that Rothery would be hard-pressed to make effective use of its legal remedies against breach. Selmer Co. v. Blakeslee-Midwest Co., 704 F.2d 924 (7th Cir.1983); Vines v. General Outdoor Advertising Co., 171 F.2d 487, 490 (2d Cir.1948) (L. Hand, J.); Garshman v. Universal Resources Holding Inc., 824 F.2d 223, 232 (3d Cir.1987). In fact some of the letters to carrier agents in which Atlas demanded a change in the contract fixed deadlines before October 6, and in the end Atlas terminated the contract before that date. But Rothery does not argue duress, and probably could not do so persuasively. For back in 1983 no one knew whether Atlas could terminate at will or must wait till October 6 (no one knows today), and it is not duress for a party to a contract to act upon a plausible, even if uncertain, interpretation of his rights. There is also no indication that Rothery lacked the resources to press a legal claim for breach of contract effectively; this suit as well as the antitrust suit show that Rothery is able to invoke the aid of the courts.
 
 
 18
 Nothing that Atlas did in 1983 broke its contract with Rothery; and whether there was a breach in 1985 as a result of Atlas's terminating the contract before the anniversary of its signing is moot. We therefore agree with the district judge's result, though not with all his reasoning. The other issues raised by the parties (Atlas argues, for example, that it had good cause to terminate the contract when it did) are moot on the view we take of the case.
 
 
 19
 AFFIRMED.