[Cite as *Westlake v. Cleveland*, 2017-Ohio-4064.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 104282**

---

# CITY OF WESTLAKE

PLAINTIFF-APPELLEE

vs.

# CITY OF CLEVELAND

DEFENDANT-APPELLANT

---

## JUDGMENT:
REVERSED AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-12-782910

**BEFORE:** Stewart, P.J., S. Gallagher, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** June 1, 2017

**ATTORNEYS FOR APPELLANT**

Robert J. Hanna
Susan M. Audey
Karl A. Bekeny
Tucker Ellis L.L.P.
950 Main Avenue, Suite 1100
Cleveland, OH 44113

Barbara A. Langhenry
Director of Law
City of Cleveland Law Department
601 Lakeside Avenue, Room 106
Cleveland, OH 44114


**ATTORNEYS FOR APPELLEE**

Dennis M. O'Toole
Frank S. Carlson
Matthew A. Dooley
Ashleigh B. Kerr
O'Toole, McLaughlin, Dooley & Pecora
5455 Detroit Road
Sheffield Lake, OH 44054

John D. Wheeler
Director of Law
City of Westlake
27700 Hilliard Boulevard
Westlake, OH 44145

MELODY J. STEWART, P.J.:

{¶1} In 1990, defendant-appellant city of Cleveland and plaintiff-appellee city of Westlake entered into a water service agreement ("agreement") in which the Cleveland Water Department would be the "sole and exclusive supplier" of water to Westlake for a period of ten years, with automatic annual renewals unless either side gave notice, five years in advance, of intent to terminate. Years later, after becoming dissatisfied with Cleveland's water service and pricing, Westlake began exploring the possibility of establishing its own water department and purchasing water from the Avon Lake Water Department. As part of that effort, Westlake filed this action seeking a declaration of its rights and responsibilities under the agreement. It asked the court to declare that the agreement terminated after a period of 25 years and that Cleveland could not recover "stranded" or other additional costs.

{¶2} While the declaratory judgment action was pending, Cleveland invoked a clause of the agreement that allowed it to enact rate increases for customers "who have taken steps towards leaving the Cleveland water system." Ostensibly intended to recoup $51 million in "stranded" costs relating to capital improvements of water lines within Westlake, the rate increases would result in additional costs of approximately $5,000 per homeowner and just over $100,000 for large commercial establishments for the remainder of the five-year notice period.

**{¶3}** Westlake asked the court to enjoin Cleveland's imposition of the rate increases. After the court granted a preliminary injunction to stay Cleveland's rate increases, the parties filed cross-motions for summary judgment. Westlake cited the terms of a memorandum of understanding signed by both parties at the same time they signed the agreement in which they acknowledged that Westlake was not granting Cleveland an exclusive franchise to furnish water. Westlake argued that the memorandum of understanding amended the terms of the agreement to grant Cleveland a non-exclusive franchise to furnish water. Additionally, Westlake argued that its charter prohibited a franchise charter in excess of 25 years, a fact memorialized by its city council in enabling legislation to approve the water contract with Cleveland. That legislation granted Cleveland a non-exclusive franchise to provide water "for a period of twenty-five (25) years." Westlake maintained that the agreement expired on March 19, 2015, at which point Cleveland's subsequent attempts to increase water rates would be a nullity.

**{¶4}** Cleveland argued that Westlake did not grant it the property right of a "franchise" to furnish water, but merely a contractual right to be the sole supplier of water. It further argued that the agreement did not expire by its own terms after 25 years because Westlake granted Cleveland the property right to enter Westlake for 10 years, with subsequent annual terms. Cleveland rejected Westlake's assertion that the memorandum of understanding amended the terms of the agreement: it argued that an integration clause of the contract foreclosed reference to the memorandum of understanding and, in any event, the memorandum of understanding merely memorialized

the parties' understanding that the agreement was not intended to grant an exclusive franchise. It further rejected reliance on the terms of the Westlake enabling ordinance, pointing out that legislation was one-sided because Cleveland was not a party to the ordinance and the ordinance could not be construed as manifesting Cleveland's capitulation to amending the agreement.

{¶5} The court ruled that the agreement had been amended by both the memorandum of understanding and the Westlake ordinance granting Cleveland a non-exclusive franchise to operate a public utility for a period of 25 years. The court ruled that the agreement terminated on March 19, 2015, and was no longer enforceable, and that the provision requiring five-years notice of intent to terminate was no longer applicable. The court ruled that Westlake could obtain water from a secondary source without violating the agreement. Finally, the court ruled that Cleveland was not entitled to recover stranded costs.

{¶6} Cleveland's sole assignment of error complains that the court erred by granting summary judgment and permanently enjoining it from enforcing its rate increases to recover stranded costs. It maintains that the memorandum of understanding did not amend the agreement, but merely memorialized the parties' understanding that the agreement did not violate Westlake's city charter by granting the Cleveland Water Department an exclusive franchise to provide water service for more than 25 years.

{¶7} A Civ.R. 56 motion for summary judgment rests on the assertion that there are no genuine issues of material fact and that the moving party is entitled to judgment as

matter of law. To the extent the nonmoving party maintains there are genuine issues of material fact, the court is required to construe the facts most favorably to the nonmoving party. *See* Civ.R. 56(C). However, when there are cross-motions for summary judgment, both parties represent that there are no genuine of issues of material fact. *Sesko v. Hutchins Caw, Inc.*, 8th Dist. Cuyahoga No. 87359, 2006-Ohio-5434, ¶ 2; *Cincinnati v. Ohio Council 8, Am. Fedn. of State, Cty. & Mun. Emps.*, 93 Ohio App.3d 162, 164, 638 N.E.2d 94 (1st Dist.1994). We thus take the underlying facts as established for purposes of this appeal.[1]

**{¶8}** The water service agreement was written on a master form that Cleveland drafted and used with all of its political subdivision water customers. Article 5 of the agreement states:

> 5.01. In consideration of the agreement of PURVEYOR and provided that Purveyor conforms all water rate increases strictly to the provisions of Article 4 of this AGREEMENT, and in consideration of the agreement of PURVEYOR to finance and construct the capital improvements provided for in Article 20 of this AGREEMENT, MUNICIPALITY agrees that it will not directly or indirectly, alone or together with others, by court proceedings or in any other way attempt to obstruct, enjoin, hinder or disable PURVEYOR from setting, charging, and collecting rates that PURVEYOR in its sole discretion deems necessary to enable PURVEYOR to fulfill its obligations hereunder. In addition, MUNICIPALITY agrees that PURVEYOR shall be the sole and exclusive supplier of water to MUNICIPALITY and its inhabitants for the term of this AGREEMENT.

**{¶9}** Article 23 of the agreement, titled "TERM OF AGREEMENT," states:

---

[1] Both the court and parties described the factual background leading to the agreement in great detail. Those facts, however, are irrelevant to the legal question before us on appeal — whether the court erred in how it interpreted the agreement.

23.01. The term of this AGREEMENT shall be for a minimum period of ten (10) years commencing on the first day after execution of this AGREEMENT by PURVEYOR, and shall automatically continue in effect from year to year thereafter. This AGREEMENT may be cancelled by either party hereto by giving written notice to the other party at least five (5) years prior to the effective date of termination, provided that no such notice may be given until five (5) years after the date upon which this AGREEMENT is executed by PURVEYOR.

{¶10} Before signing the agreement, Westlake had concerns about both the duration of the agreement and making Cleveland the "sole" provider of water to Westlake. Westlake's charter does not provide for exclusive franchises. The charter does allow the city to grant non-exclusive franchises, but Article XI, Section 5 of the Westlake City Charter states: "the Council may by ordinance grant a non-exclusive franchise to a person, firm or corporation to construct or operate a public utility on, across, under, over or above any public street or real estate within the Municipality for a period not in excess of twenty-five (25) years." Westlake told Cleveland that the "sole and exclusive supplier" language of the agreement ran afoul of its charter.

{¶11} The Cleveland assistant law director assigned to the matter was aware that Westlake believed that it could not sign the agreement as drafted: "I believe that the issue [the Westlake law director] presented to me was that Westlake had a charter provision [sic] prohibited Westlake from signing this agreement and, and [sic] that was the subject of our discussion." The parties agreed to sign a memorandum of understanding in which they stated that "in consideration of the execution of the [agreement]" they "mutually agree" that:

Article 5 of the Contract provides that Cleveland will be the sole supplier of water to Westlake. Cleveland and Westlake agree that the language of Article 5 of the Contract is not intended to grant an exclusive franchise to provide water service to Westlake and its inhabitants in violation of Westlake's Charter which prohibits the granting of an exclusive franchise for utility service to any utility company.

Westlake acknowledges that, as of the date of the Contract, Cleveland has been and will continue to be the sole supplier of water to Westlake and its inhabitants during the term of the Contract because there are no alternative sources of water to supply the community.

However, in the event that the second sentence of Article 5 of the Contract is construed to be invalid, illegal or unenforceable, pursuant to paragraph 26.03 of the Contract, such invalidity shall not effect any other term or provision of the Contract, and the Contract shall be interpreted and construed as if the sentence had never been contained therein.

{¶12} After reciting other agreements unrelated to this litigation, the memorandum of understanding concluded with the parties agreeing that "the foregoing represents their understanding of the provisions of the [agreement] and agree that this Memorandum of Understanding shall remain on file with said [agreement]."

{¶13} Section 3 of the enabling legislation enacted by the Westlake City Council authorizing its mayor to enter into the agreement states: "That this Council grants to the City of Cleveland, pursuant to Article XI, Section 5, a non-exclusive franchise to construct and operate a public utility for the furnishing to the City of Westlake and its inhabitants potable water for a period of twenty-five (25) years." *See* Westlake Ordinances No. 1989-7.

{¶14} Both the memorandum of understanding and the enabling legislation enacted by the Westlake City Council were forwarded to Cleveland. Cleveland signed

the agreement and returned it along with the memorandum of understanding and a copy of the Westlake enabling legislation. The parties do not dispute that March 19, 1990, was the effective date of the agreement.

{¶15} There are two points to be made about the interaction between the agreement and the Westlake charter. First, the Westlake charter only prohibits the city from (1) entering into an exclusive franchise and (2) entering into a *non-exclusive* franchise in excess of 25 years. Second, the agreement provided for a term of ten years, after which it would "automatically continue in effect from year to year thereafter" unless cancelled by written notice.

{¶16} With respect to the first point, the court found that Westlake could not enter into the agreement as written because the "sole provider" language would grant Cleveland an *exclusive* franchise to provide water to Westlake. The Westlake charter makes no provision for the granting of exclusive franchises. Cleveland argues that the "sole provider" language did not grant a franchise, but a contractual right to be the sole supplier of water to Westlake. Cleveland argues that a "franchise" is a property right to enter the streets of Westlake to construct and operate a utility, but does not prohibit a utility from being a sole supplier.

{¶17} Cleveland's argument fails to account for Article 7 of the agreement, which separately addresses the "property right" granted to it. That section states that Cleveland has the right to use Westlake's streets, easements, and other public ways for the "purpose of laying, extending, maintaining and repairing water mains and doing such other acts"

necessary for the delivery of water to Westlake. This part of the agreement would embody Cleveland's understanding of the property right granted to it.

{¶18} Because Article 7 specifically addresses what Cleveland claims is the property right encompassed by a franchise, we give independent meaning to Article 5 of the agreement, titled in part as "EXCLUSIVE FRANCHISE." While it is true that section headings in a contract are not binding provisions, *Jordan v. Marion Technical College*, 3d Dist. Marion No. 9-90-36, 1991 Ohio App. LEXIS 3966, at 5 (Aug. 15, 1991), there is no doubt that Article 5 addresses Cleveland's desire to be the sole provider of water for Westlake in a manner inconsistent with Cleveland's assertion that it dealt only with property rights. Cleveland drafted the agreement, so the court correctly viewed the use of the words "exclusive franchise" used in Article 5 as being conceptually different than the property rights granted under Article 7. *World v. Grange Mut. Cas. Co.*, 148 Ohio St.3d 11, 2016-Ohio-2913, 68 N.E.3d 738, ¶ 36.

{¶19} In addition, Cleveland's interpretation of Article 5 is contrary to the express terms of the memorandum of understanding. Given that Westlake had no authority to grant an exclusive franchise, the memorandum of understanding made it clear that the "sole provider" language of Article 5 was "not intended to grant an exclusive franchise to provide water service to Westlake and its inhabitants in violation of Westlake's Charter which prohibits the granting of an exclusive franchise for utility service to any utility company." The parties went on to recite their understanding that although Cleveland was apparently Westlake's only source for obtaining water at the time, that did not mean

that Cleveland had an exclusive franchise to provide water.  In other words, the parties agreed that Cleveland was the sole supplier of water to Westlake only because Westlake had no other options.  These recitations made it clear that Westlake granted Cleveland a non-exclusive franchise to supply water.

{¶20} Our reference to the memorandum of understanding brings us to a key issue in the case: whether the court erred by finding that the memorandum of understanding amended the terms of the agreement.

{¶21} Cleveland argues that the plain language of the memorandum of understanding contains no terms to amend or otherwise modify the agreement.  It asserts that Article 26.02 of the agreement contains an integration clause stating that the agreement "contains all the promises, agreements, conditions, inducements and understandings" between the parties and that there were "no promises, agreements, conditions, understandings, inducements, warranties or representations, oral or written, express or implied" other than as set forth in the agreement.

{¶22} Cleveland acknowledges, however, that Article 26.01 of the agreement provided that the agreement could be modified by "a written instrument executed by the party against whom enforcement of such * * * modification is sought."  It also did not dispute below that the memorandum of understanding was a "negotiated" instrument. Nevertheless, it maintains that "the only 'negotiation' that took place was that the document *memorialized* the parties' *understanding* of certain parts of the Agreement." (Emphasis sic.)

{¶23} The "intent of the parties is presumed to reside in the language they chose to use in their agreement." *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313, 667 N.E.2d 949 (1996). That being so, it is unclear why there would be a need for Cleveland to separately "negotiate" its subjective understanding of the agreement. The word "negotiate" means to engage in discussion to reach a mutual agreement. If the parties truly were negotiating their subjective understanding of the meaning of the agreement, it was because there was some ambiguity or concern over the terms of agreement. The undisputed facts show this to be the case: Westlake consistently told Cleveland that it could not accept the water service agreement drafted by Cleveland because the provision granting Cleveland an exclusive franchise to supply water to Westlake would violate the Westlake charter.

{¶24} The memorandum of understanding was thus the product of a fundamental disagreement over whether Westlake could, consistent with the agreement as drafted, grant Cleveland an exclusive franchise to supply water. By indicating their understanding that the agreement was not granting Cleveland an exclusive franchise to supply water to Westlake, the parties were changing the meaning of Article 5. This is the logical dilemma that Cleveland faces: if the Article 5 term "franchise" is not used in the classic legal sense of granting a property right — an argument we reject — then the memorandum of understanding makes clear the parties' intention that Westlake was only granting Cleveland a non-exclusive franchise.

{¶25} It is true that the parties did not use the word "amend" in the memorandum of understanding, but viewed in context, the memorandum of understanding had that affect. This conclusion is compelled by other parts of the memorandum of understanding where the parties made new promises not contained in the agreement. For example, the parties agreed that "in any construction project performed by Cleveland or its contractor in Westlake, pursuant to the Contract, Cleveland shall designate Westlake's inspectors to oversee all aspects of pavement restoration at no cost to Cleveland or its contractor." They also agreed that "Cleveland agrees that payments will not be made to Cleveland's contractor for pavement restoration work in Westlake until Westlake states in writing that the work has been completed to Westlake's satisfaction and that all areas disturbed by Cleveland's contractor, or those in its employ, have been satisfactorily restored." In both examples, the parties were acting to amend the terms of the agreement, even though they did not use the word "amend."

{¶26} We hold that the court did not err by finding that the memorandum of understanding amended the agreement to allow Westlake to grant a non-exclusive franchise.

{¶27} Cleveland next argues that the court erred by concluding that Westlake Ordinances 1989-7 also amended the agreement. Cleveland maintains that no amendment occurred because the ordinance is a one-sided legislative document to which Cleveland was not a party.

{¶28} Westlake Ordinances 1989-7 states in relevant part:

SECTION 1: That the Mayor be and he is hereby authorized to enter into a Water Service Agreement for direct service for furnishing to the City of Westlake and its inhabitants potable water, which said Agreement is attached hereto and made a part hereof as though fully rewritten herein and marked Exhibit A, and further provided that the terms and conditions of the Agreement do not conflict with any provision of the Charter of the City of Westlake * * *.

SECTION 3: That this Council grants to the City of Cleveland, pursuant to Article XI, Section 5, a non-exclusive franchise to construct and operate a public utility for the furnishing to the City of Westlake and its inhabitants potable water for a period of twenty-five (25) years * * *.

{¶29} We agree with Cleveland that the ordinance could not amend the agreement because it contained none of the elements of a contract. *Clifton Hills Realty Co. v. Cincinnati*, 60 Ohio App. 443, 449, 21 N.E.2d 993 (1st Dist.1938) ("It is clear that in passing zoning ordinances a municipal council is engaged in legislating and not in contracting.").

{¶30} However, municipalities cannot exercise power that they do not have. And those who would enter into contracts with municipalities are on notice of this limitation. For example, in *United Fuel Gas Co. v. Ironton*, 107 Ohio St. 173, 140 N.E. 884 (1923), the Ohio Supreme Court considered whether a municipality could enter into a rate contract for a period of 25 years when, under the law in force at the time the city granted the franchise, it had no power to make a rate contract in excess of ten years. The Supreme Court held that "[i]f the municipality had attempted arbitrarily to fix a rate for a period of twenty-five years there could be no doubt of its invalidity." *Id*. at 182. And in *Wellston v. Morgan*, 59 Ohio St. 147, 52 N.E. 127 (1898), the Ohio Supreme Court made the point clear:

Where a statute gives power to a municipal corporation to contract for the lighting of its streets and other public grounds for a period not exceeding ten years, the conclusive implication is that such corporation is forbidden to contract for a longer period. And where such corporation undertakes, by the passage of an ordinance, to contract with an electric light company for an exclusive privilege to such company for the use of its streets, and stipulating for the lighting of the street, et cetera, for ninety-nine years, at a given price per month, such ordinance is ultra vires and void, and the contractual stipulations contained therein are equally void, and neither party can enforce them.

*Id*. at paragraph one of the syllabus.

{¶31} Cleveland entered into the agreement with Westlake knowing that Westlake could only grant a franchise that is non-exclusive and for no more than 25 years. As stated in *People ex rel. N.Y. v. Nixon*, 229 N.Y. 356, 361, 128 N.E. 245 (1920), "[s]tatutes then existing are read into the contract. They enter by implication into its terms. They do not change the obligation. They make it what it is." *See also Jacot v. Secrest*, 153 Ohio St. 553, 558, 93 N.E.2d 1 (1950), quoting *Banks v. DeWitt*, 42 Ohio St. 263 (1884), paragraph two of the syllabus ("A contract made in pursuance of a statute or resolution, must be construed as though such statute or resolution had been incorporated into such contract."). Ordinance 1989-7 did not amend the agreement, but it did put Cleveland on notice that the agreement only provided a non-exclusive franchise. And the Westlake Charter, being a document of independent legal force, likewise put Cleveland on notice that Westlake could only grant a non-exclusive franchise.

{¶32} We also find that Ordinance 1989-7 did not establish the length of the agreement at 25 years. Unlike the question of whether granting an exclusive franchise to Cleveland would violate the Westlake charter, the terms of the agreement provided for an

initial contract period of ten years that would "automatically continue in effect from year to year thereafter" unless terminated by written notice. On its face, these terms do not run afoul of the Westlake charter.

**{¶33}** Cleveland argued below that the initial ten-year period had passed, so the agreement continued in force year to year unless cancelled by either party or renegotiated. Cleveland was careful, however, to insist that "[t]he Agreement is for an initial 10-year term that continues *annually*." (Emphasis sic.) Cleveland motion for summary judgment at 23. Without conceding that its argument could result in a perpetual contract, Cleveland nonetheless maintains that "the Agreement should continue year to year unless the five-year notice provision is triggered." *Id*. at 24.

**{¶34}** Cleveland's argument tries to have it both ways: while being careful not to characterize the agreement as perpetual (that would run afoul of the Westlake charter limiting non-exclusive franchises to 25 years), it essentially claims that the contract continues indefinitely unless a party opts out or the agreement is renegotiated ("the expiration date of the Agreement is not fixed." Cleveland motion for summary judgment at 24).

**{¶35}** Courts disfavor perpetual contracts and "an intention to create such a perpetuity must be clearly shown." *Hallock v. Kintzler*, 142 Ohio St. 287, 287, 51 N.E.2d 905 (1943). Because Westlake could not grant a franchise exceeding 25 years, the agreement could not be perpetual. Construing the plain language of the agreement, *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 652 N.E.2d 684

(1995), we find as a matter of law that the agreement provided for an initial ten-year term with one-year renewals thereafter.

{¶36} The court did not ignore the agreement language relating to duration, but presumed that the language used in Ordinance 1989-7 — that Cleveland was granted a non-exclusive franchise to supply Westlake with water "for a period of twenty-five (25) years" — was chosen for the specific purpose of amending Cleveland's standardized agreement "because any other interpretation would render those clear provisions of Westlake Ordinances 1989-7 to be 'meaningless or unnecessary.'"

{¶37} Unlike provisions of the agreement discussed above relating to the exclusivity of the franchise, the ten-year length of the agreement with yearly renewals did not plainly violate the Westlake charter. The Westlake charter only prohibited non-exclusive franchises lasting more than 25 years. The agreement limited its duration to ten years with yearly renewals. In related circumstances, courts have held that "year to year" contracts are not perpetual, but annual contracts. *Hallock* at 289. As an annual contract, it was renewable on the same terms contained in the original ten-year term, but as a new contract lasting for a single year:

> Here the new agreement grows out of, and is founded upon, the possession evidenced by the holding over, and is therefore referable to it, rather than to the possession under the prior agreement which had expired. The holding over is equivalent to a new entry; or, as said in Reed on the Statute of Frauds, section 806, concerning the application of the statute in such cases, the "effect of entry under a void lease, and of holding over after the expiration of a valid one, is identical."

*Baltimore & O. R. Co. v. West*, 57 Ohio St. 161, 168, 49 N.E. 344 (1897). *See also Kazmaier v. Fat Jacks, L.L.C.*, 6th Dist. Wood Nos. WD-09-048 and WD-09-057, 2010-Ohio-3627. The memorandum of understanding is silent on the agreement's duration. So unlike the nature of the franchise granted, the omission suggests that the parties had no misgivings about the duration of the agreement such that they were compelled to express their understanding in a separate document. The evidence indicates that both parties were satisfied that the agreement fully expressed their intent with regard to the length of the agreement.

{¶38} It is true that Ordinance 1989-7 speaks in terms of granting a non-exclusive franchise for a period of "twenty-five (25) years," but that fact alone did not amend the agreement. The court could correctly find that both the memorandum of understanding and Ordinance 1989-7 served to amend the agreement with respect to the type of franchise granted because the agreement as written would have been in violation of the Westlake charter. But nothing about the agreement having an initial term of ten years to be followed by yearly renewals was in conflict with the Westlake charter. That part of Ordinance 1989-7 authorizing the Westlake mayor to enter into an agreement for 25 years was actually immaterial to the agreement. The court erred by finding that Ordinance 1989-7 amended the agreement to state a finite term of 25 years.

{¶39} Having found that the court erred by concluding that the agreement provided for a 25-year contract that expired on its own in March 2015, we must necessarily find that the court likewise erred by ruling that the notice provision was no longer enforceable

because the 25-year contract had expired. This does not necessarily mean, however, that a *five-year* notice provision was, or is, enforceable.

{¶40} With the parties operating under a year-to-year agreement, a new agreement arose every year. For this reason, the five-year notice provision would be unenforceable — it is irreconcilable to require that notice be given five years in advance of an intent to terminate a one-year contract. In the analogous situation of a tenant holding over after the expiration of a commercial lease term in which a new contract arises year to year, the Ohio Supreme Court has held that "[n]otice to quit is not necessary to terminate a tenancy from year to year arising from the tenant holding over his term." *Gladwell v. Holcomb*, 60 Ohio St. 427, 431, 54 N.E. 473 (1899). *See also 3637 Green Rd. Co. v. Specialized Component Sales Co.*, 8th Dist. Cuyahoga No. 103599, 2016-Ohio-5324, ¶ 40. While cases like *Gladwell* involve real property leases and have been superseded by statute in the residential setting,[2] there is no reason why the principles in those cases should not apply with equal force to other kinds of contracts.

{¶41} Nevertheless, the notice provision shows that the parties contemplated that some notice of termination be given. Whenever possible, courts should effectuate the parties' contractual intent. *State ex rel. Kabert v. Shaker Hts. City Sch. Dist. Bd. of Edn.*, 78 Ohio St.3d 37, 44, 676 N.E.2d 101 (1997). "Usually when a contract is terminable on a specified date, the contract also specifies a date before then by which notice of

---

[2] R.C. 5321.17(B) now requires a landlord or a tenant wishing to terminate a month-to-month lease to give notice of termination "at least thirty days prior to the periodic rental date." This statute applies only to residential leases, not commercial leases. *3637 Green Rd. Co.* at ¶ 40.

termination must be sent or received." *R.S. & V. Co. v. Atlas Van Lines, Inc.*, 917 F.2d 348, 351 (7th Cir.1990). The agreement between the parties made it clear that this is not the kind of arrangement where one of the parties could simply walk away from the agreement on March 19. Delivery of potable water is complex. Ceasing delivery requires more than the mere flip of a switch. Some period of transition is necessary for the parties, and this means that some period of reasonable notice is required. *Grandview Hts. v. Columbus*, 174 Ohio St. 473, 190 N.E.2d 453 (1963), paragraph two of the syllabus. What constitutes reasonable notice is a question of fact, *Davis v. Loopco Indus., Inc.*, 66 Ohio St.3d 64, 66, 609 N.E.2d 144 (1993).

{¶42} Having concluded that the agreement now exists year to year and that either party may chose not to renew it after reasonable notice, we next consider the court's ruling that Cleveland was not entitled to recover "stranded costs" from Westlake based on Cleveland's determination that Westlake took steps toward leaving the Cleveland water system. The court found that Westlake did not give Cleveland notice of its intent to terminate the agreement, but merely informed Cleveland that it "cannot and will not continue with the purchase of water from the City of Cleveland after the expiration of the 25 year period[.]" It concluded that Westlake's letter did not constitute "progressive actions towards leaving the system," but was a "recurring reminder[ ] * * * that Westlake was not contractually obligated to purchase water from Cleveland after the established termination of the agreement on March 19, 2015."

**{¶43}** Cleveland maintains that Westlake gave notice of intent to terminate the agreement, an act that allowed Cleveland to increase its water rates to allow it to recover certain stranded costs. And in addition to arguing that it could recoup these costs, Cleveland maintains that after Westlake gave notice of intent to terminate the agreement, it had an unfettered right to set water rates — that it could adjust water rates for any reason, at any time, and for any price it desired.

**{¶44}** Article 4.01 of the agreement states that "[n]o increase shall be made in the rate for any customer without simultaneously increasing the rates for all other customers * * *." That provision, however, does not apply to any customer or classes of customers "taking steps toward leaving the Cleveland water system[.]" *See* Article 4.02(1).[3]

**{¶45}** The phrase "taken steps toward leaving the Cleveland water system" is not a model of clarity. Giving those words their ordinary meaning, *Lager v. Miller-Gonzalez*, 120 Ohio St.3d 47, 2008-Ohio-4838, 896 N.E.2d 666, ¶ 15, we conclude that Article 4.02(1) can be invoked only if Westlake took concrete, affirmative action to terminate the agreement. To read the phrase more broadly would engender speculation and ambiguity, particularly since the agreement between the parties entails a non-exclusive franchise.

---

[3] Used in context, the phrase "customer" or "classes of customers" appears to refer to individual end-users and not the "Municipality" as defined in the recitals to the agreement. Nevertheless, applying Section 4.02(1) to individual end-users would arguably be absurd because Cleveland cannot seek to invalidate the established water rate structure on the basis that an end-user moved out of the Cleveland water system. The parties appear to agree for purposes of this case that the word "customer" in Section 4.02(1) refers to Westlake and not individual Westlake end-users.

**{¶46}** The broad interpretation urged by Cleveland as to what constitutes "steps" to leave its water system is belied by its own actions in this case. Cleveland states that as early as April 2007, it became aware that Westlake was exploring its water service options. Appellant's brief at 17-18. And Cleveland states that by September 2011, Westlake's mayor told Cleveland's mayor that "they were going to leave the system." *Id.* at 20. Yet Cleveland did not invoke Article 4.02(1), even though the court found that "any effort by Westlake to investigate alternatives is viewed by Cleveland as a concrete step towards leaving the water system." Had Cleveland understood the phrase "taking steps" in the manner in which it now argues, one wonders why it did not invoke Article 4.02(1) long ago.

**{¶47}** To be sure, giving actual notice of intent to terminate the agreement would be taking steps toward leaving the water system. Cleveland argues that Westlake did just that in a May 2013 letter it received from Westlake in which it claims that Westlake "officially and unequivocally" informed Cleveland that "Westlake cannot and will not continue with the purchase of water from the City of Cleveland * * *[.]"

**{¶48}** Cleveland's partial quote is misleading. The Westlake letter stated:

Westlake cannot and will not continue with the purchase of water from the City of Cleveland after the expiration of the 25 year period referenced in the Westlake Charter and the Memorandum of Understanding, all as the same relates to agreement #42180, fully executed on 3-19-1990 and entitled "City of Cleveland Water Service Agreement" with the City of Westlake.

The full quote makes it clear that Westlake believed that it was "prohibited from having a water supply agreement with Cleveland that exceeds the 25-year limitation established in the Westlake Charter." The letter memorialized Westlake's assertion that the agreement would terminate on its own on March 19, 2015. Thinking that an agreement was to expire on its own terms and acknowledging as much, is not the same as taking an affirmative step to terminate the agreement. And as further evidence that the letter was not a clear step to leave the Cleveland water system, Westlake wrote in the letter that "we would certainly entertain a competitive proposal and a new agreement to purchase potable water in bulk from the City of Cleveland." This statement could certainly be viewed as Westlake's interest in remaining a part of the Cleveland water system.

{¶49} Even if we were to construe the May 2013 letter as an unequivocal notice of Westlake's intent to leave the Cleveland water system, we agree with the trial court that Article 4.02(1) does not entitle Cleveland to recover stranded costs.

{¶50} After receiving Westlake's letter, Cleveland determined that under Article 4.02(1) the rate covenants in the agreement were no longer in force and that it could raise Westlake's water rates at its discretion. Cleveland's city council then enacted Cleveland Ordinances No. 1354-13, codifying Cleveland Codified Ordinances 535.041, effective January 1, 2014, stating that "in addition to the fixed and water consumption charges" assessed to direct service accounts, "all accounts for direct water service to the City of Westlake shall contain a fixed charge based on meter size to cover costs associated with the separation of Westlake from the Cleveland Water System * * *." Those increases

were based on Cleveland having a total of 65 points of connection, 37 of which are where Westlake is connected to Cleveland water mains, and 28 of which are connections to the four communities surrounding Westlake: Fairview Park, North Olmsted, Bay Village, and Rocky River. Cleveland maintained that those connection points would need to be disconnected and rerouted at a cost of $19 million. In addition, Cleveland claimed a right to recover $39 million in uncollected operating costs and uncollected capital costs. The surcharge was to be applied in 17 quarterly installments at a rate of $291 for most residential customers and as much as $5,272 for larger commercial customers.

{¶51} The court found that Cleveland was not entitled to recover stranded costs from Westlake because there was no provision in the agreement providing for the recovery of stranded costs. Additionally, the court found that even if there was such a provision, it would only apply if Westlake gave actual notice of its intent to terminate the agreement. Having found that Westlake did nothing more than repeatedly remind Cleveland that the agreement would expire on its own terms, the court concluded that the termination provisions of the agreement were never triggered.

{¶52} When granting Westlake's motion for a preliminary injunction, the court found as a matter of law that Cleveland Ordinances No. 1354-13 "does not convey proper authority to the City of Cleveland to impose the fixed water charges on the citizens of Westlake." The court reached this conclusion by making several observations regarding Cleveland's right to assess Westlake water users to cover costs associated with Westlake's separation from the Cleveland water system — notably that the agreement

contains no definition of "stranded" costs, that there were discrepancies regarding Cleveland's methodology for determining the amount of stranded costs, and that it would be "shocking" that Cleveland's water rates had not already factored in the costs that could potentially arise were a municipality to leave the water system.

{¶53} We agree with the trial court that nothing in the agreement allows Cleveland to recoup stranded costs by special assessment to the citizens of Westlake. Article 4 of the agreement comprehensively addresses "water" rates — it says nothing about surcharges. And there is no question that Cleveland was imposing a surcharge on Westlake water customers. The ordinance plainly states that the amounts to be derived were "in addition to" established water rates. By characterizing the surcharge as a "fixed" charge, Cleveland proved the point that the surcharge had nothing to do with actual consumption — all direct billing customers were to be assessed a surcharge even if they did not use a single drop of water. Cleveland Ordinances No. 1354-13 provided for a surcharge that bore no relation to Westlake customers' actual usage, so the surcharge was beyond the scope of what was permitted under Article 4.02(1).

{¶54} In summary, we conclude that the water service agreement was a non-exclusive agreement for a minimum period of ten years, with annual renewals that constitute new agreements each year. As annual agreements, they do not violate the terms of the Westlake charter that limit the term of non-exclusive franchises to 25 years. With the five-year notice of termination inapplicable to a yearly agreement, a question of

fact exists as to how much notice should be provided. Cleveland has no contractual right to enact surcharges to recover stranded costs.

**{¶55}** Judgment reversed and remanded for proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MELODY J. STEWART, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., CONCURS IN JUDGMENT ONLY;
SEAN C. GALLAGHER, J., CONCURS IN PART AND DISSENTS IN PART (WITH SEPARATE OPINION)

SEAN C. GALLAGHER, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶56} I respectfully concur in part and dissent in part with the majority opinion. In this case, both sides are arguing that the other "wants to eat their cake and have it too." Westlake received the benefit of quality water and infrastructure maintenance and improvements, built into water rates for 25 years, but now wants to walk away free and clear of any costs to Cleveland or other suburban communities that would be incurred with that departure. On the other side, Cleveland wants to compel Westlake to remain in its system, seemingly forever, or pay a hefty penalty to terminate the WSA.

{¶57} Westlake sought five declarations in its complaint: (1) that Westlake had the right to obtain a secondary source of water without breaching the WSA; (2) that the WSA does not require the purchase of a definable amount of water; (3) that the five-year notice provision is unenforceable; (4) that the WSA automatically expires after 25 years; and (5) that Cleveland cannot recover stranded costs or costs to cure from Westlake or its inhabitants.

{¶58} Initially, the parties might have explored whether the complaint in this case is entirely grounded as a declaratory judgment action on the contract at issue. It would seem that Westlake requested the trial court to determine the general rights of the parties following the termination of the WSA, at this point a hypothetical event. "The purpose of a declaratory judgment action is to dispose of 'uncertain or disputed obligations quickly and conclusively,' and to achieve that end, the declaratory judgment statutes are to be construed 'liberally'" to a certain extent. *Mid-Am. Fire & Cas. Co. v. Heasley*, 113

Ohio St.3d 133, 2007-Ohio-1248, 863 N.E.2d 142, ¶ 8, quoting *Ohio Farmers Indemn. Co. v. Chames*, 170 Ohio St. 209, 213, 163 N.E.2d 367 (1959). Declaratory relief cannot circumvent the prohibition against advisory opinions: they are only to decide an actual controversy to confer rights or status upon the litigants based on interpreting contractual rights. *Id.* at ¶ 9, quoting *Corron v. Corron*, 40 Ohio St.3d 75, 79, 531 N.E.2d 708 (1988). The possibility of hypothetical events or a future contingency is not sufficient to create an actual controversy. *Id.*, quoting *League for Preservation of Civ. Rights v. Cincinnati*, 64 Ohio App. 195, 197, 28 N.E.2d 660 (1st Dist.1940). The WSA unambiguously provides that either party may terminate the WSA, and the effect of that decision is beyond the scope of a declaratory judgment action.

{¶59} The contract in this case is problematic, but beyond seeking injunctive relief precluding Cleveland from hiking the water rates upon Westlake and its inhabitants and seeking a determination as to whether the WSA was still in force and effect, no other relief was sought from an actual controversy. Much of the discussion focused on what would occur should Westlake seek to divorce itself from Cleveland. In my view, the WSA does not address the ultimate issue this court is being asked to resolve: that is, what is the effect of Westlake as a municipality terminating the WSA and leaving the Cleveland water system? The parties do not appear to be concerned with the scope of the declaratory judgment being sought, so that issue is simply noted.

{¶60} Although I agree that Westlake's charter precludes exclusive-franchise contracts and the MOU must modify the contract provision under Article 5, in my view,

eliminating the exclusive nature of the original contract does not get Westlake off the hook. For years, Cleveland was the only water option, and now Westlake has a potential second option in Avon Lake. Despite this new reality, under the terms of the contract, Cleveland remains the sole provider. Cleveland provided water and maintained and improved Westlake's infrastructure based on their reliance on the contract and the contract's assurance they would be the sole provider for its duration. Both sides benefitted over the life of the agreement. Cleveland had a consistent revenue stream, and the Westlake government had the guarantee of safe, quality water for its citizens with maintenance and infrastructure costs, at least for consumers, absorbed into the price of the water. As long as the contract is in force, Cleveland remains the sole provider.

{¶61} I agree with the majority that (1) the trial court erred in finding that Westlake ordinance 1989-7 amended the agreement; (2) the initial contract term was ten years followed by a series of self-renewing year-to-year contracts; (3) these year-to-year renewals do not violate the 25-year preclusion against nonexclusive franchises (this eliminates any concerns that the WSA violated Westlake's Charter — even if Cleveland is considered a non-exclusive franchise under the MOU); (4) because the parties are operating under a year-to-year agreement, the five-year notice provision is unenforceable; (5) the case should be remanded to the trial court for a determination on what constitutes reasonable notice; and (6) the phrase "taking steps toward leaving the Cleveland water system" requires a concrete, affirmative act to terminate the agreement.

**{¶62}** Thus, I agree with the majority that the trial court erred in finding the contract expired on March 19, 2015. With respect to the meaning of Westlake's letter to Cleveland dated May 2, 2013, unlike the majority, I would find it was a clear notice of Westlake's intent to terminate the agreement. Nevertheless, I believe this letter was premised on a mistake of fact by Westlake officials. That is, the Westlake officials mistakenly thought the contract expired after 25 years with an ending date of March 19, 2015. Because this letter was grounded on a fact that was erroneous, I would find it to be a nullity. In my view, the parties remain in the same positions they were in prior to the letter, albeit now under a year-to-year agreement.

**{¶63}** Unlike the majority, I would not foreclose the prospect of Cleveland seeking recovery of so-called "stranded" costs or separation costs, whether they be for the 65 points of connection or the rerouting requirements that would occur should disconnections be required, or even the claimed uncollected operating or capital improvement costs, if these are found to be viable. These costs would have to be proven; but in any event, I believe the question of Cleveland being able to recover these costs, and from whom, is premature.

**{¶64}** To this point, under the WSA, Westlake is defined as the "municipality" and Cleveland is defined as the "purveyor." Article 4.02 states that Cleveland may institute a rate increase on "all customers or class of customers who have taken steps toward leaving" the water system. Under the WSA, a Westlake homeowner is a "direct service customer," which is defined as "an owner of premises located outside purveyor's

municipal boundaries who receives water and water related services from purveyor and who is billed by and pays to purveyor directly for such water and water services." Westlake as a municipality attempted to give notice of its intent to end the agreement.

{¶65} If damages occur as a result of disconnection and rerouting or because of uncollected operating or capital improvement costs, those will have to be addressed in a separate cause of action — the only claims advanced in the complaint are for declaratory and injunctive relief. If Cleveland feels aggrieved by a breach or termination of the WSA, the likely remedy is a separately presented cause of action that would necessarily include any dispute over the amount of water that must be purchased following the termination of the WSA. We can make no determination of the rights between the parties following the termination of an agreement, only those rights as in existence during the operative period of the contract. At this stage of the proceedings, any discussion of the damages caused by Westlake and Cleveland's divorce would be premature.